(PRIZE.)

*L'Invincible.*—The CONSUL OF FRANCE, and HILL & M'COBB, *Claimants.*

During the late war between the United States and Great Britain, a French privateer, duly commissioned, was captured by a British cruiser, afterwards recaptured by an American privateer; again captured by a squadron of British frigates, and recaptured by another American privateer, and brought into a port of the United States for adjudication. Restitution, on payment of salvage, was claimed by the French consul. A claim was also interposed by citizens of the United States, who alleged that their property had been unlawfully taken by the French vessel before her first capture, on the high seas, and prayed an indemnification from the proceeds. Restitution to the original French owner was decreed; and it was held, that the courts of this country have no jurisdiction to redress any supposed torts committed on the high seas upon the property of its citizens by a cruiser regularly commissioned by a foreign and friendly power, except where such cruiser has been fitted out in violation of our neutrality.

APPEAL from the circuit court for the district of Massachusetts.

The French private armed ship L'Invincible, duly commissioned as a cruiser, was, in March, 1813, captured by the British brig of war La Mutine. In the same month she was recaptured by the American privateer Alexander; was again captured, on or about the 10th of May, 1813, by a British squadron, consisting of the frigates Shannon and Tenedos; and, afterwards, in the same month, again recaptured by the American privateer Young

Teazer, carried into Portland, and libelled in the district court of Maine for adjudication, as prize of war. The proceedings, so far as material to be stated, were as follows: At a special term of the district court, held in June, 1813, a claim was interposed by the French consul on behalf of the French owners, alleging the special facts above mentioned, and claiming restitution of the ship and cargo, on payment of salvage. A special claim was also interposed by Mark L. Hill, and Thomas M'Cobb, citizens of the United States, and owners of the ship Mount Hope, alleging, among other things, that the said ship, having on board a cargo on freight, belonging to citizens of the United States, and bound on a voyage from Charleston, S. C. to Cadiz, was, on the high seas, in the latter part of March, 1813, in violation of the law of nations, and of treaties, captured by L'Invincible, before her capture by La Mutine, and carried to places unknown to the claimants, whereby the said ship Mount Hope, and cargo, became wholly lost to the owners, and thereupon praying, among other things, that after payment of salvage, the residue of said ship L'Invincible, and cargo, might be condemned and sold for the payment of the damages sustained by the claimants. At the same term, by consent, an interlocutory decree of condemnation to the captors passed against said ship L'Invincible, and she was ordered to be sold, and one moiety of the proceeds, after deducting expenses, was ordered to be paid to the captors, as salvage, and the other moiety to be brought into court, to abide the final decision of the respective claims of

1816.

L'Invincible

1816.

L'Invincible

the French consul and Messrs. Hill & M'Cobb. The cause was then continued for a further hearing unto September term, 1813, when Messrs. Maisonarra & Devouet, of Bayonne, owners of L'Invincible, appeared under protest, and in answer to the libel and claim of Messrs. Hill & M'Cobb alleged, amor other things, that the ship Mount Hope was lawfully captured by L'Invincible, on account of having a British license on board, and of other suspicious circumstances, inducing a belief of British interests, and ordered to Bayonne for adjudication; that (as the protestants believed) on the voyage to Bayonne the Mount Hope was recaptured, by a British cruiser, sent into some port of Great Britain, and there finally restored by the court of admiralty to the owners, after which she pursued her voyage, and safely arrived, with her cargo, at Cadiz, and the protestants thereupon prayed that the claim of Messrs. Hill & M'Cobb might be dismissed. The replication of Messrs. Hill and M'Cobb denied the legality of the capture, and the having a British license on board the Mount Hope, and alleged embezzlement and spoliation by the crew of L'Invincible, upon the capture; admitted the recapture by a British cruiser, and the restitution by the admiralty upon payment of expenses, and prayed that the protestants might be directed to appear absolutely and without protest. Upon these allegations the district court overruled the objections to the jurisdiction of the court, and compelled the owners of L'Invincible to appear absolutely, and without protest, and thereupon the

owners appeared absolutely, and alleged the same
matters in defence which were stated in their answer
under protest,' and prayed the court to assign
Messrs. Hill & M‘Cobb to answer interrogatories
touching the premises, which was ordered by the
court. Accordingly, Messrs. Hill & M‘Cobb made
answer to the interrogatories proposed, except an
interrogatory which required a disclosure of the
fact, whether there was a British license on board,
which M‘Cobb (who was master of the Mount
Hope at the time of the capture) declined answer-
ing, upon the ground that he was not compelled to
answer any question, the answer to which would
subject him to a penalty, forfeiture, or punishment;
and this refusal, the district court, on application,
allowed. Hill, in answer to the same interrogatory,
denied any knowledge of the existence of a British
license. The cause was, thereupon, heard on the
allegations and evidence of the parties, and the dis-
trict court decreed that Messrs. Hill & M‘Cobb
should recover against the owners of L'Invincible
the sum of 9,000 dollars damages, and the costs of
suit. From this decree the owners appealed to the
circuit court, and in that court their plea to the ju-
risdiction was sustained, and the claim of Messrs.
Hill & M‘Cobb dismissed, with costs. An appeal
was, thereupon, entered by them to this court.

*Dexter*, for the appellants. The sole question is,
whether the district court of Maine had jurisdiction.
It is a case where a citizen, against whose property

1816.

L'Invincible

a tort has been committed on the high seas, appears in his own natural forum, and the *res*, which was the instrument of the wrong done, is within the territorial jurisdiction of his own country, and in possession of the court for other (lawful) purposes when he applies for justice. 1. An injury of this nature is either to be redressed by a process *in rem* or *in personam*, and in either case, application must be made where the *thing*, or *person*, is found. The action is transitory in both cases; where the party proceeds *in rem*, the possession of the thing gives jurisdiction to the tribunal having that possession. It is said, that in prize proceedings, the forum of the captor is the only one having jurisdiction. But what is the extent of the principle, and what are the exceptions to the rule? The rule is not of a nature peculiar to prize proceedings, but is rather a corollary from the general principles of admiralty jurisdiction. The locality of the question of prize or no prize must have been originally determined by the *fact* of the property being carried *infra præsidia* of the captor's country, and in possession of its courts. I agree that the possession of the thing does not give jurisdiction to a *neutral* country, and the reason is, because the country *is neutral*. But this has only been recently settled; and in the reign of Charles II. the question was referred to the crown lawyers in England, (then neutral,) whether the property of English subjects, unjustly taken by foreign cruisers, should not be restored to them by the English court."

*a* 2 *Browne's Civ.* and *Adm. Law,* 256.

It is, however, now determined that, unless there has been a breach of neutrality in the capture, the courts of a neutral state cannot *restore*, much less *condemn*. But this concession does not shake the position, that local jurisdiction is founded upon the possession of the *res*, which in this case having escaped from the former captor, the action becomes transitory, and follows the thing. There are several decisions of this court, all confirming, either directly or by analogy, the position now taken.[b] In the famous report of Sir George Lee, &c., on the memorial of the king of Prussia's minister, relative to the non-payment of the Silesian loan, which was intended to maintain the strongest maritime pretensions of Great Britian, the only passage that even glances at the doctrine of the exclusive jurisdiction of the courts of the captor's country is, that all captors are bound to submit their seizures to adjudication, and that the *regular and proper* court is that of their own country. But this principle is sustained rather by the authority of usage and treaties, than by elementary writers; and yet, all the other incidental questions are illustrated by multifarious citations of elementary books, equally respected in Prussia as in England. The reporters do not fairly meet the menace of the Prussian monarch, to set up courts of prize in his own dominions; but content themselves with asserting that it would be irregular, absurd, and impracticable.

b 3 *Dall.* 6, Glass *v.* the Betsey.  3 *Dall.* 133, Talbot *v.* Jansen. 3 *Dall.* 333, Del Col. *v.* Arnold.  3 *Dall.* 133, The Mary Ford.

244

Had it been at that time settled by European jurists of authority, the question would not have been made; or if made, would have been satisfactorily answered. The general principle has been rather *assumed*, than *proved*: And the practice of one nation, at least, contradicts it; for the ordinance of Louis XIV. restores the property of French subjects brought into the ports of France.[c]  2. Suppose the

c *Ordonnance de la Marine*, liv. 3. tit. 9., *Des Prises*, art. 15. The same provision is contained in the 16th article of the Spanish ordinance of 1718; and Valin considers the restitution of the effects as a *just recompense for the benefit rendered* to the captor, in granting him an asylum in the ports of the neutral country to whose subjects those effects belong. But Azuni contests this opinion, and maintains that the obligation to restore in this case is founded on the universal law of nations. Part 2, c. 4. art. 3. s. 18. And it must be confessed, that the reasons on which Valin rests his opinion are by no means satisfactory; so that the French and Spanish ordinances are evidently mere municipal regulations, which have not been incorporated into the code of public law, and cannot be justified upon sound principles. It is an observation, somewhere made by M. Portalis, that such regulations are not, properly speaking, to be considered laws, but are essentially variable in their nature, *pro temporibus et causis*, and are to be tempered and modified by judicial wisdom and equity. These ordinances are indeed supported by the practice of the Italian states, and the theory of certain Italian writers. Among the latter are Galliani and Azuni, both of whom maintain, each upon different grounds, the right of the neutral power, within whose territorial jurisdiction a prize is brought, to adjudicate upon the question of prize or no prize, so far as the property of its own subjects are concerned. They are, however, opposed by their own countryman, Lampredi, who, after assigning the reasons for his dissent, concludes thus,—" *Egli*" (the neutral) *dunque dovrà rispettare questo possesso* (that of the captor) *lasciando che i giudici costituiti dal Sovrano del predatore lo dichiarino o legittimo, o illegittimo, e così o liberino la preda, o la facciano passare in dominio del predatore, purche questo giudizio si faccia fuori del suo territorio, ove nessuno usurpar*

question of prize or no prize to be exclusively within the jurisdiction of the courts of the capturing power, yet that question does not arise in the present case. This is a question of *probable cause.* If the commander of L'Invincible took *without* probable cause, he had no right; if he took *with* probable cause, then the claimants have sustained no injury, and ought not to recover damages; consequently, no injury can result from the court taking cognizance of the suit. As to the spoliation after the capture, that is still less a question of prize. 3. But be the general principles as they may, the jurisdiction having attached for other purposes on recapture, the former owner of a vessel unlawfully taken and despoiled by the prize, comes in and claims damages under the law of nations.

*Pinkney,* contra. If there be any rule of public-

pù i dirriti spettanti al sommo impero. E falso adunque in dirrito quello, che asserisce il Galiani, ed il progetto, ch'egli propone sul giudizio delle prede non si portrebbe eseguire senza lesione dei diritti sovrani. *Lampredi,* p. 228. Since the decision of the case to which this note is appended, the following may be considered as the only exceptions to the general rule; that the question of prize or no prize, with all its incidents, is only to be determined in the courts of the captor's nation established in his country, or in that of an ally or co-belligerant. 1st. The case of a capture made by the cruisers of the belligerants within the jurisdiction of a neutral power; and 2d, That of a capture made by armed vessels fitted out in violation of its neutrality, and where the captured property, or the capturing vessel, is brought into its ports. The obvious foundation of these exceptions is to be discovered in the right and the duty of every neutral state to maintain its neutrality impartially, and neither to do nor suffer any act which might tend to involve it in the war.

1816.

L'Invincible lic law better established than another, it is, that the question of prize is solely to be determined in the courts of the captor's country. The report on the memorial of the king of Prussia's minister, refers to it as the customary law of the whole civilized world. The English courts of prize have recorded it; the French courts have recorded it; this court has recorded it. It pervades all the adjudications on the law of prize, and it lays, as an elementary principle, at the very foundation of that law. The whole question, then, is, whether this case be an exception to the general rule. The positive law of nations has ordained the rule; the natural law of nations has assigned the reasons on which it is founded; and *Rutherforth*, in his Institutes,[c] explains those reasons, which arise from the amenability of governments to each other. A cruiser is amenable only to the government by whom he is commissioned; that government is amenable to the power whose subjects are injured by him; and after the ordinary prize judicature is exhausted, they are to apply to their own sovereign for redress. The principal object of that judicature is the examination into the conduct of the captors. The question of property is merely incidental. But, whatever the question may be, it is to be judged exclusively by the courts of the capturing power. It is contended, on the other side, that this jurisdiction must be exerted *in rem* ; but the jurisdiction to which *Rutherforth* refers is much more extensive, not confining it to the question whether the property be translated. If the

c *2 Rutherforth's Institutes* 594.

thing be within the possession of the court, then it exerts a jurisdiction *in rem*, by restitution, or condemnation, as the case may be. But if not, then it exerts it on the person, and inquires into the manner in which the captor has used his commission, and whether any wrong has been done to friends, under colour of its authority. It is a gratuitous assumption, that prize jurisdiction is always *in rem*, as that of the ordinary court of admiralty usually is. The commissioned captor cannot be responsible to any but his own sovereign; from him he receives the law which forms his rule of conduct. Sir William Scott expressly admits that his king can give him the law, and the judges of other European countries practically admit the same thing. *A fortiori*, can the sovereign give it to his delegated cruisers; he being answerable over, in the first instance, diplomatically, and finally by war, to the injured nation. The captor is responsible only through the courts of his own country. 2. Is this case an exception to the general rule? The reasons of the allowed exceptions do not apply to this case. Thus the cases are, of violation of neutral territory; or where a commission is issued to subjects of the neutral country; or, lastly, of a prize brought into its territorial limits with neutral property on board. In the case of Talbot v. Jansen the commission was null, and captures under it were void; it was equivalent to no commission at all. Here is no pretence that the commission was null; that she had been fitted out here; or that the thing captured had been brought within the grasp of our municipal law; or that the capture was made within our limits. In

1816.     Del Col v. Arnold the ground of the decision was,
          that the thing was brought voluntarily into our
L'Invincible
          limits, and the wrong done within those limits.
          The judgment must be supported on that ground,
          or it cannot be supported at all.  As to the Bet-
          sey, its authority is doubtful, and it cannot be
          referred to any intelligible principle, unless it be
          that the belligerant captor submits to the neutral
          jurisdiction, by bringing the property within it.
          The Cassius,[d] is directly in point for the captors in
          the case now before the court.  Why was the libel-
          lant's application refused in that case?  Because the
          thing captured was not brought in; thereby showing
          that, in the present case, the prize not having been
          brought in, damages cannot be awarded against the
          captor.  As to the ordinance of Louis XIV., it goes
          no further than this court did in the case of the Bet-
          sey.  The same authority has been practically as-
          sumed among the Italian states; but further no na-
          tion, ancient or modern, has gone.  The natural,
          customary, and conventional law of nations, are all
          equally adverse to it.  The claimants have a remedy,
          correspondent to the extent of their injury, in the
          courts of France.  The prize jurisdiction is as ef-
          fectually exerted when the property *is not*, as when
          *it is*, within its control.  The cases are multiplied
          where the thing is even lost, of an application com-
          pelling the captor to proceed to adjudication; if he
          fails to show that the capture was lawful, he is
          mulcted in costs and damages.[e]  The cruisers of

          *d* 3 *Dall.* 121.
          *e* 1 *Rob.* 93.   The Betsey

every nation are bound to obey the instructions of the sovereign power, whether lawful or not. The condemnations under the British orders in council of November, 1793, were reversed by the lords of appeal, and mere dry restitution decreed, without damages, because the cruisers were justified by the instructions. But the commissioners under the 7th article of the British treaty of 1794, gave damages for what the lords of appeal were obliged judicially to refuse them, upon the authority of *Rutherforth*, and upon the ground that the British government was answerable over to the injured power. In the present case, if justice should be refused in the courts of France, the French government would be answerable over to this country. The process is here, in effect, *in personam*, and it is as if the captor were here. You go beyond retaining your own property merely, and lay your hand on his; which is his by the municipal code only : by the law of nations it is the property of the state. It is certain he was not originally responsible personally, and the capture and recapture can have made no difference. The acts exerted over him by the enemy could not have changed his responsibility; nor can the captor's having failed to proceed to adjudication in France, for the claimants may compel him; nor the bringing in of his vessel, for, as to him, it was involuntary. 3. *Probable cause* is emphatically a question of prize or no prize; but it is not always the same by the law of different countries. The law of France must, therefore, be looked into, and applied to the case, which the French courts only are competent to expound. If their

exposition does injustice to the party, his remedy is by application to his own government. So, also, is the question of spoliation a question of prize; and the prize court, having jurisdiction of the principal matter, has jurisdiction of all its incidents.

*Dexter*, in reply. 1. There is only one authority produced to show that the prize jurisdiction is exclusively in the courts of the capturing power. *Rutherforth* speaks only of cases where the proceeding is to condemn, or restore, the captured property. When he, or any other writer, gives the reasons for his opinion, the latter is worth just as much as the former, and no more. What is the reason? He says it cannot be known before trial that forcible possession was lawful; and if unlawful, it could not give jurisdiction. It may be answered, in every case where jurisdiction is gained by possession, it is unknown before trial whether it was obtained lawfully, or by force, or fraud. All right of jurisdiction from possession is thus equally denied. The other party cannot be injured by submitting to the jurisdiction while that uncertainty remains. If it shall appear that the possession was unlawfully acquired, he will be restored to his right by the exercise of jurisdiction. *Rutherforth* asserts, that the true ground of prize jurisdiction is, that the state of the captor is responsible to other states for his misconduct. It may be answered, that when the state has only granted a lawful commission, and has not assented to any unlawful act done by colour of it, such state is not responsible, though the act be unlawful.

For the naked unauthorized act, then, the state is not accountable. The unjust judgment of a neutral state, condemning the property, might make the latter state answerable, but not the former. The reasoning goes on the supposition that the state of the captor might relieve itself from responsibility by doing justice, in restoring the property. This can only be done where the property can be reached by it. Holding jurisdiction would rather relieve the state of the captor from responsibility; for either the injury of the complaining party would be repaired, or the courts of his own country would determine that he had not suffered any. There is no distinction between the property being lawfully brought in, as in this case, or voluntarily, as in the case of the Betsey. The injured party has an election to proceed *in personam* against the owners, or *in rem* against the inanimate instrument of the wrong. 2. There may be a jurisdiction to *restore*, without invading the exclusive prize jurisdiction of the captor's country. Let the court take jurisdiction, and if it turns out to be a question of prize or no prize, then dismiss the suit. Suppose the question to be, whether the captor had a commission, must we not proceed further, and see what is the extent of that commission? And if the act done exceed its limits, has not the neutral state a right to adjudge costs and damages to its citizens injured, without any authority from the captor's sovereign? 3. The vessel is in judicature, rightfully and lawfully. The party now protesting against the jurisdiction, had submitted to it for another purpose. He claims his property upon the payment of salvage.

1816.

L'Invincible

1816.

L'Invincible

The obvious answer to his demand is, When you have discharged all liens, you shall have it. The court of admiralty, having jurisdiction for another purpose, like a court of chancery in the case of a mortgage, has a right to do complete equity. Why is restitution decreed in the case of violated territory? Because the courts of the neutral state, having jurisdiction for the principal purpose of avenging its violated sovereignty, also takes jurisdiction of all the incidents.

March 11th.

JOHNSON, J., delivered the opinion of the court.

It would be difficult to distinguish this case, in principle, from those of the Cassius and the Exchange,[g] decided in this court. The only circumstance, in fact, in which they differ, is, that in those cases, the vessels were the property of the nation; in *this* it belongs to private adventurers. But the commission under which they acted was the same; the same sovereign power which could claim immunities in those cases equally demands them in this; and although the privateer may be considered a volunteer in the war, it is not less a part of the efficient national force, set in action for the purpose of subduing an enemy. There may be, indeed, one shade of difference between them, and it

---

[g] February Term, 1812. In this case it was determined that a public vessel of war, belonging to the Emperor Napoleon, which was before the property of a citizen of the United States, and, as alleged, wrongfully seized by the French, coming into our ports, and demeaning herself in a friendly manner, was exempt from the jurisdiction of this country, and could not be reclaimed by the former owner in its tribunals.

1816.

L'Invincible

is that which is suggested by *Rutherforth* in the passage quoted in the argument. The hull, or the owners of the privateer, may, perhaps, under some circumstances, be subject to damages in a neutral court after the courts of the captor have decided that the capture was not sanctioned by his sovereign. But, until such a decision, the seizure by a private armed vessel is as much the act of the sovereign, and entitled to the same exemption from scrutiny, as the seizure by a national vessel. In the case of the Cassius, which belonged to the French republic, the vessel was finally prosecuted and condemned on an information *qui tam*, under the act of Congress for an illegal out-fit, and thus had applied to her, under the statute, the principle which dictated the decision in the case of Talbot v. Jansen with relation to a private armed vessel. As to the restitution of prizes, made in violation of neutrality, there could be no reason suggested for creating a distinction between the national and the private armed vessels of a belligerent. Whilst a neutral yields to other nations the unobstructed exercise of their sovereign or belligerant rights, her own dignity and security require of her the vindication of her own neutrality, and of her sovereign right to remain the peaceable and impartial spectator of the war. As to her, it is immaterial in whom the property of the offending vessel is vested. The commission under which the captors act is the same, and that alone communicates the right of capture even to a vessel which is national property.

But it is contended that, admitting the general principle, that the exclusive cognizance of prize questions belongs to the capturing power, still the peculiar circumstances of this case constitute an exception, inasmuch as the recapture of the Mount Hope puts it out of the power of the French courts to exercise jurisdiction over the case. This leads us to inquire into the real ground upon which the exclusive cognizance of prize questions is yielded to the courts of the capturing power. For the appellants, it is contended, that it rests upon the *possession* of the subject matter of that jurisdiction; and as the loss of possession carries with it the loss of capacity to sit in judgment on the question of prize or no prize, it follows, that the rights of judging reverts to the state whose citizen has been devested of his property. On the other hand, I presume, by the reference to Rutherforth, we are to understand it to be contended that it is a right conceded by the customary law of nations, because the captor is responsible to his sovereign, and the sovereign to other nations.

But we are of opinion that it rests upon other grounds; and that the views of Vattel on the subject are the most reconcilable to reason, and the nature of things, and furnish the easiest solution of all the questions which arise under this head. That it is a consequence of the equality and absolute independence of sovereign states, on the one hand, and of the duty to observe uniform impartial neutrality, on the other.

Under the former, every sovereign becomes the acknowledged arbiter of his own justice, and cannot,

consistently with his dignity, stoop to appear at 1816.
the bar of other nations to defend the acts of his
commissioned agents, much less the justice and le- L'Invincible
gality of those rules of conduct which he prescribes
to them. Under the latter, neutr .:s are bound to with-
hold their interference between the captor and the
captured; to consider the fact of possession as con-
clusive evidence of the right. Under this it is, also,
that it becomes unlawful to devest a captor of pos-
session even of the ship of a citizen, when seized
under a charge of having trespassed upon belliger-
ant rights.

In this case the capture is not made as of a ves-
sel of the neutral power; but as of one who, quitting
his neutrality, voluntarily arranges himself under
the banners of the enemy. On this subject there
appears to be a tacit convention between the neutral
and belligerant; that, on the one hand, the neutral
state shall not be implicated in the misconduct of the
individual; and on the other, that the offender shall
be subjected to the exercise of belligerant right. In
this view the situation of a captured ship of a citizen
is precisely the same as that of any other captured
neutral; or, rather, the obligation to abstain from in-
terference between the captor and captured becomes
greater, inasmuch as it is purchased by a concession
from the belligerant, of no little importance to the
peace of the world, and particularly of the nation of
the offending individual. The belligerant contents
himself with cutting up the unneutral commerce, and
makes no complaint to the neutral power, not even

where the individual rescues his vessel, and escapes into his own port after capture.

Testing this case by these principles, it will be found that, to have sustained the claim of the appellants, the court below would have violated the hospitality which nations have a right to claim from each other, and the immunity which a sovereign commission confers on the vessel which acts under it; that it would have detracted from the dignity and equality of sovereign states, by reducing one to the condition of a suitor in the courts of another, and from the acknowledged right of every belligerant to judge for himself when his own rights on the ocean have been violated or evaded; and, finally, that it would have been a deviation from that strict line of neutrality which it is the universal duty of neutrals to observe—a duty of the most delicate nature with regard to her own citizens, inasmuch as through their misconduct she may draw upon herself the imputation of secretly supporting one of the contending parties. Under this view of the law of nations on this subject, it is evident that it becomes immaterial whether the *corpus* continue *sub potestate* of the capturing power, or not. Yet, if the recapture of the prize necessarily draws after it consequences so fatal to the rights of an unoffending individual as have been supposed in the argument, it may well be asked, shall he be referred for redress to courts which, by the state of facts, are rendered incompetent to afford redress?

The answer is, that this consequence does not follow from the recapture. The courts of the cap-

tor are still open for redress. The injured neutral, it is to be presumed, will there receive indemnity for a wanton or illicit capture; and if justice be refused him, his own nation is bound to vindicate, or indemnify him.

Some confusion of idea appears to hang over this doctrine, resulting chiefly from a doubt as to the mode in which the principle of exclusive cognizance is to be applied in neutral courts to cases as they arise; and this obscurity is increased by the apparent bearing of certain cases decided in this court in the years 1794 and 1795.

The material questions necessary to be considered, in order to dissipate these doubts, are, 1st. Does this principle properly furnish a plea to the jurisdiction of the admiralty courts? 2d. If not, then does not jurisdiction over the subject matter draw after it every incidental or resulting question relative to the disposal of the proceeds of the *res. subjecta?*

The first of these questions was the only one settled in the case of Glass v. The Betsey, and the case was sent back with a view that the district court should exercise jurisdiction, subject, however, to the law of nations on this subject as the rule to govern its decision.

And this is certainly the correct course. Every violent dispossession of property on the ocean is, *prima facie*, a maritime tort; as such, it belongs to the admiralty jurisdiction. But sitting and judging, as such courts do, by the law of nations, the moment it is ascertained to be a seizure by a commissioned cruiser, made in the legitimate exercise of the rights

of war, their progress is arrested; for this circumstance is, in those courts, a sufficient evidence of right.

That the mere fact of seizure as prize does not, of itself, oust the neutral admiralty court of its jurisdiction, is evident from this fact, that there are acknowledged cases in which the courts of a neutral may interfere to devest possessions; to wit, those in which her own right to stand neutral is invaded: and there is no case in which the court of a neutral may not claim the right of determining whether the capturing vessel be, in fact, the commissioned cruiser of a belligerent power. Without the exercise of jurisdiction thus far, in all cases, the power of the admiralty would be inadequate to afford protection from piratical capture. The case of Talbot v. Jansen, as well in the reasoning of the judges as in the final decision of the case, is fully up to the support of this doctrine. But it is supposed that the case of the Mary Ford supports the idea, that as the court had acknowledged jurisdiction over the question of salvage, its jurisdiction extended over the whole subject matter, and authorized it to proceed finally to dispose of the residue between the parties litigant.

That case certainly will not support the doctrine to the extent contended for in this case. It is true, that the court there lay down a principle, which, in its general application is unquestionably correct, and which, considered in the abstract, might be supposed applicable to the present case. But this presents only one of innumerable cases which occur in

our books to prove how apt we are to misconceive and misapply the decisions of a court, by detaching those decisions from the case which the court propose to decide. The decision of the supreme court in that case is in strict conformity with that of the circuit court in the present case. For when the court come to apply their principle, they do not enter into the question of prize between the belligerants, but decree the residue to the last possessor: thus making the fact of possession, as between the parties litigant, the criterion of right; and this is, unquestionably, consistent with the law of nations. Those points, which can be disposed of without any reference to the legal exercise of the rights of war, the court proceeds to decide; but those which necessarily involve the question of prize or no prize, they remit to another tribunal.

It would afford us much satisfaction could we, with equal facility, vindicate the consistency of this court in the case of Del Col v. Arnold. To say the least of that case, it certainly requires an apology. We are, however, induced to believe, from several circumstances, that we have transmitted to us but an imperfect sketch of the decision in that case. The brevity with which the case is reported, which we are informed had been argued successively at two terms, by men of the first legal talents, necessarily suggests this opinion; and when we refer to the case of the Cassius, decided but the term preceding, and observe the correctness with which the law applicable to this case, in principle, is laid down in

*1816.*

*L'Invincible*

1816.

L'Invincible

the recital to the prohibitions, we are confirmed in that opinion.

But the case itself furnishes additional confirmation. There is one view of it in which it is reconcilable to every legal principle. It appears that, when pursued by the Terpsicore, the Grand Sachem was wholly abandoned by the prize crew, and left in possession of one of the original American crew, and a passenger; that, in their possession, she was driven within our territorial limits, and was actually on shore when the prize crew resumed their possession, and plundered and scuttled her. Supposing this to have been a case of total dereliction, (an opinion which, if incorrect, was only so on a point of fact, and one in support of which much might be said, as the prize crew had no proprietary interest, but only a right founded on the fact of possession,) it would follow, that the subsequent resumption of possession was tortious, and subjected the parties to damages. On the propriety of the seizure of the Industry, to satisfy those damages, the court give no opinion, but place the application of the proceeds of the sale of this vessel on the ground of consent; a principle, on the correctness of the application of which to that case, the report affords no ground to decide.

But, admitting that the case of the Grand Sachem was decided under the idea that the courts of the neutral can take cognizance of the legality of belligerant seizure, it is glaringly inconsistent with the acknowledged doctrine in the case of the Cassius and of Talbot v. Jansen, decided the term next

preceding; and in the Mary Ford, decided at the same term with that of the Grand Sachem. The subject has frequently, since that term, been submitted to the consideration of this court, and the decision has uniformly been, that it is a question exclusively proper for the courts of the capturing power.