17 U.S. 37 (____)
4 Wheat. 37
The DIVINA PASTORA: The SPANISH CONSUL, Claimant.
Supreme Court of United States.

*40 Winder, for the appellants.
Webster and D.B. Ogden, contra.
*42 MARSHALL, Ch. J., delivered the opinion of the court.
The decision at the last term, in the case of the United States v. Palmer, 3 Wheat. 610, establishes the principle, that the government of the United States, having recognised the existence of a civil war between Spain and her colonies, but remaining neutral, the courts of the Union are bound to consider as *64] lawful those acts which war authorizes, and which *the new governments *43 in South America may direct against their enemy. Unless the neutral rights of the United States, as ascertained by the law of nations, the acts of congress, and treaties with foreign powers, are violated by the cruisers sailing under commissions from those governments, captures by them are to be regarded by us as other captures, jure belli, are regarded; the legality of which cannot be determined in the courts of a neutral country. If, therefore, it appeared in this case, that the capture was made, under a regular commission from the government established at Buenos Ayres, by a vessel which had not committed any violation of our neutrality, the captured property must be restored to the possession of the captors. But if, on the other hand, it was shown, that the capture was made in violation of our neutral rights and duties, restitution would be decreed to the original owners.
But the pleadings in this case are too informal and defective, to pronounce a final decree upon the merits. The proceedings in the admiralty must always contain, at least, a general allegation of such a nature as will apply to the case, as of prize, &c. The court has always endeavored to keep these proceedings within some kind of rule, though not requiring the same technical strictness as at common law. Here, the pleadings present a case which may be consistent with the demand of the former owners for restitution, but which is tied up to such a state of facts as, if proved, will not authorize it; and will not admit the introduction of evidence varying from the facts alleged. The decree of the circuit court must, therefore, *be [*65 reversed, and the cause remanded to that court, with directions to permit the pleadings to be amended, and for further proceedings.
Cause remanded.[(a)]
*44 
*45 
*46 
*47 
NOTES
[(a)] It is a principle which has been frequently laid down by this court, that it is the exclusive right of governments to acknowledge new states arising in the revolutions of the world, and until such recognition by our government, or by the government of the empire to which such new state previously belonged, courts of justice are bound to consider the ancient state of things as remaining unchanged. Rose v. Himely, 4 Cranch 292; Gelston v. Hoyt, 3 Wheat. 324. The distinction between the recognition of the independence of a newly-constituted government, which separates itself from an old-established empire, and the recognition of the existence of a civil war between such new government and the parent country, is obvious. In the latter case, the very object of the contest is, what the former supposes to be decided. But in the meantime, all the belligerent rights which belong to anciently-established governments, except so far as they may be restrained by treaty stipulations, belong to both parties. The obligations which neutrality imposes, are also to be fulfilled towards each party. What are those obligations, and how they may be affected by the misconduct of the belligerents, has been frequently made a subject of decision in this court.

Thus, where the commander of a French privateer, called the Citizen Genet, having captured, as prize, on the high seas, the sloop Betsey, sent the vessel into the port of Baltimore; and upon her arrival there, the owners of the sloop and cargo filled a libel in the district court of Maryland, claiming restitution, because the vessel belonged to subjects of Sweden, a neutral power, and the cargo was owned jointly by Swedes, and by citizens of the United States, also neutral; it was held, that the district court of Maryland had jurisdiction competent to inquire, and to decide, whether in such case, restitution ought to be *made to the claimants, or either of them, in whole or in [*66 part; that is, whether such restitution could be made consistently with the law of nations, and the treaties and laws of the United States. Glass v. The Betsey, 3 Dall. 6, 16. This case has been sometimes criticised, as involving a denial of the unquestionable principle of public law, that the judicial cognisance of prizes belongs exclusively to the tribunals of the captor's country, with the admitted exceptions of a violation of neutral sovereignty, either in making the capture, or fitting out the armament with which it is made, within the neutral territory. But, as is very justly observed by the court in the case of The Invincible, the only point settled by the case of Glass v. The Betsey was, that the courts of the neutral country have jurisdiction of captures made in violation of its neutrality, and the case was sent back with a view that the district court should exercise jurisdiction, subject, however, to the law of nations on this matter, as the rule to govern its decision. 1 Wheat. 257. So also, it was held, in the same case, that no foreign power can, of right, institute or erect any court of judicature, of any kind, within the jurisdiction of the United States, but such only as may be warranted by, and be in pursuance of treaties: and that the admiralty jurisdiction which had been exercised in the United States, by the consuls of France, in the beginning of the war of 1793, not being so warranted, was illegal. Glass v. The Betsey, 3 Dall. 6, 16.
The district courts of the United States have no jurisdiction on a libel for damages for the capture of a vessel as prize, by the commissioned cruiser of a belligerent power, although the captured vessel is alleged to belong to citizens of the United States, and although the capturing vessel and her commander be found and proceeded against within the jurisdiction of the court; the captured vessel having been captured and carried infra præsidia of the captors. United States v. Peters, 3 Dall. 121.
The capture of a vessel from a belligerent power, by a citizen of the United States, under a commission from another belligerent power (though the captor sets up an act of *67] expatriation, not carried into effect by a departure from the United *States, with an intention to settle permanently in another country), is an unlawful capture, and the courts of the United States will decree restitution to the original owner. Talbot v. Jansen, 3 Dall. 133, 164. A capture by a citizen of a neutral state, who sets up an act of expatriation to justify it, is unlawful, where the removal from his own country was by sailing, cum dolo et culpa, in the capacity of a cruiser against friendly powers. Ibid. 153. Quære? Whether a citizen of the United States, expatriating himself according to the law of a particular state of the Union, of which he is also a citizen, can be considered as having lost the character of a citizen of the United States, so as to be authorized to capture under a foreign commission the property of powers in amity with the United States? Ibid. 153. A capture by a vessel, built, owned and fitted out as a vessel of war, in a neutral country, is unlawful, and restitution of the property captured by such vessel, will be decreed by the courts of the neutral country, if brought within its jurisdiction. Ibid. 155, 167. Every illegal act committed on the high seas, does not amount to piracy; a capture, although not piratical, may be illegal, and of such a nature as to induce the court to award restitution. Ibid. 154, 160. A capture made by a lawfully commissioned cruiser, through the medium and instrumentality of a neutral, who had no right to cruise, is unlawful; and the property captured will be restored by the neutral state, if brought within its jurisdiction. Ibid. 155. 167. The exemption of belligerent captures, on the high seas, from inquiry by neutral courts, belongs only to a belligerent vessel of war, lawfully commissioned; and if a vessel claims that exemption, it is the duty of the court, upon application, to make inquiry, whether she is the vessel she pretends to be. Ibid. 139. If, upon such inquiry, it appears, that the vessel pretending to be a lawful cruiser, is really not such, but uses a colorable commission for the purposes of plunder, she is to be considered, by the law of nations, so far at least, as the title of property or right of possession is concerned, in the same light as having no commission at all. Ibid. Primâ facie, all piracies and trespasses committed *68] against the general law of nations, *are inquirable, and may be proceeded against, in any nation, where no special exemption can be maintained, either by the general law of nations, or by some treaty which forbids or restrains it. Ibid. 160.
Where a vessel belonging to one belligerent was captured by another belligerent, and being abandoned on the high seas by the captors, to avoid the necessity of weakening their force by manning the prize, was found and taken possession of by citizens of the United States, and brought into a port of this country, and libelled in the district court for salvage; it was held, that the district court had jurisdiction upon the subject of salvage, and consequently, a power of determining to whom the residue of the property, after payment of salvage, ought to be delivered. McDonough v. The Mary Ford, 3 Dall. 188, 198. In this case, the captors acquired, immediately on the capture, such a right as no neutral nation could justly impugn or destroy; and it could not be said by the court, that the abandonment of the captured vessel revived the interest of the original proprietors. One-third of the value of the property was, therefore, decreed to the neutral salvors, and the residue restored to the captors. Ibid. This case has been sometimes supposed to involve the inconsistency of a neutral tribunal assuming jurisdiction of the question of prize or no prize, as an incident to that of salvage. But an attentive examination of the case will show, that this is a mistaken supposition. The court do not enter into the question of prize between the belligerents, but decree the residue to the late possessor: thus, making the fact of possession, as between the belligerent parties, the criterion of right. Those points which could be disposed of, without any reference to the legal exercise of the rights of war, the court proceed to decide; but those which necessarily involve the question of prize or no prize, they remit to another tribunal. L'Invincible, 1 Wheat. 259.
Where the vessel which captured the prize in question, had been built in the United States, with the express view of being employed as a privateer, in case the then existing differences between Great Britain and the United States should terminate *in [*69 war; some of her equipments were calculated for war, though frequently used by merchant ships; she was subsequently sold to a subject of one of the belligerent powers, and by him carried to a port of his own country, where she was completely armed, equipped and furnished with a commission, and afterwards, sailed on a cruise, and captured the prize, it was held, that this was not an illegal outfit in the United States, so as to invalidate the capture, and give their courts jurisdiction to restore to the original owner the captured property. Moodie v. The Alfred, 3 Dall. 307. A mere replacement of the force of a privateer, in a neutral port, is not such an outfit and equipment as will invalidate the captures made by her, and give the courts of the neutral country jurisdiction to restore the captured property to the original owner. Moodie v. The Phbe Anne, 3 Dall. 319.
A vessel and cargo belonging to citizens of the United States was captured as a prize by a cruiser belonging to one of the belligerent powers, on the high seas, and run on shore, within the territory of the United States, by the prize-master, to avoid re-capture by the other belligerent, and abandoned by the prize-crew; the vessel and cargo were then attached by the original owner, and an agreement was entered into by the parties, that they should be sold, and the proceeds paid into the district court, to abide the issue of a suit commenced by the owner against the captors for damages: held, that they were responsible for the full value of the property injured or destroyed, and that whatever might originally have been the irregularity in attaching the captured vessel and cargo, it was obviated by the consent of the captors that the prize should be sold, and that the proceeds of the sale should abide the issue of the suit. Del Col v. Arnold, 3 Dall. 233. The consistency of the court in this case cannot be vindicated with the same facility as in that of The Mary Ford. "We are, however, induced to believe, from several circumstances, that we have transmitted to us but an imperfect sketch of the decision in that case. The brevity with which a case is reported, which we are informed, had been argued successively at two terms, by men of the first legal talents, necessarily suggests this opinion; and when we refer *to the case of The Cassius [*70 (United States v. Peters), decided but the term preceding, and observe the correctness with which the law applicable to this case, in principle, is laid down in the recitals to the prohibition, we are confirmed in that opinion. But the case itself (that of Del Col v. Arnold) furnishes additional confirmation. There is one view of it in which it is reconcilable to every legal principle. It appears, that when pursued by the Terpsichore, the Grand Sachem was wholly abandoned by the prize-crew, and left in possession of one of the original American crew, and a passenger; that in their possession, she was driven within our territorial limits, and was actually on shore, when the prize-crew resumed their possession, and plundered and scuttled her. Supposing this to have been a case of total derelict (an opinion, which, if incorrect, was only so on a point of fact, and one in support of which much might have been said, as the prize-crew had no proprietary interest, but only a right founded on the fact of possession), it would follow, that the subsequent resumption of possession was tortious, and subjected the parties to damages. On the propriety of the seizure of the Industry, to satisfy those damages, the court give no opinion, but place the application of the proceeds of the sale of this vessel, on the ground of consent; a principle, on the correctness of the application of which to that case, the report affords no ground to decide." The Invincible, 1 Wheat. 259, 260.
A public vessel of war belonging to a foreign sovereign, at peace with the United States, coming into our ports, and demeaning herself in a friendly manner, is exempt from the jurisdiction of the courts of the country. The Exchange, 7 Cranch 116. If, there be no prohibition, the ports of a friendly nation are considered as open to the public ships of all other nations with whom it is at peace, and they enter such ports, and remain in them, under the protection of the government of the place. Ibid. 141. Whether the public ships of war enter the ports of another friendly nation, under the license implied by the absence of any prohibition, or under an express stipulation by treaty, they are equally exempt from the local jurisdiction. Ibid. 141. Where the private *71] vessels of one nation *enter the ports of another, under a general implied permission only, they are not exempt from the local jurisdiction. Ibid. 143. The sovereign of the place is capable of destroying the implication, under which national ships of war, entering the ports of a friendly power, open for their reception, are considered as exempted by the consent of that power from its jurisdiction. He may claim and exercise jurisdiction over them, either by employing force, or by subjecting such vessels to the ordinary tribunals. Ibid. 146. But until such power be expressly exerted, those general provisions which are descriptive of the ordinary jurisdiction of the judicial tribunals, and give an individual, whose property has been wrested from him, a right to claim that property in the courts of the country where it is found, ought not to be so construed as to give them jurisdiction in a case, in which the sovereign power has impliedly consented to waive its jurisdiction. Ibid. 140. Upon these grounds, it was determined, in this case, that a public vessel of war, belonging to the Emperor Napoleon, which had before been the property of a citizen of the United States, and, as alleged, wrongfully seized by the French, coming into our ports, and demeaning herself peaceably, could not be reclaimed by the former owner in the tribunals of this country. Ibid.
The general rule as to the prize jurisdiction is, that the trial of captures made on the high seas, jure belli, by a duly-commissioned vessel of war, whether from an enemy or a neutral, belongs exclusively to the courts of that nation to which the captor belongs. The Alerta, 9 Cranch 359, 364. But to this rule there are exceptions as firmly established as the rule itself. If the capture be made within the territorial limits of a neutral country, into which the prize is brought, or by a privateer which has been illegally equipped in such neutral country, the prize courts of such neutral country not only possess the power, but it is their duty, to restore the property so illegally captured to the owner. Ibid. 364; Talbot v. Jansen, 3 Dall. 133; Ibid. 288, note. A neutral nation may, if so disposed, without a breach of its neutral character, grant permission to both belligerents to equip their vessels of war within its territory. But without such permission, the subjects of the belligerent powers have no right to equip vessels, *72] or to augment their force, either *with arms or with men, within the territory of the neutral nation. The Alerta, 9 Cranch 365. All captures made by means of such equipments of vessels, or augmentation of their force, within the neutral territory, are illegal in respect to the neutral nation, and it is competent for its courts to punish the offenders, and in case the prizes taken by them are brought infra præsidia, to order them to be restored. Ibid. Even if there were any doubt as to the rule of the law of nations on the subject, the illegality of equipping a foreign vessel of war within the territory of the United States, is declared by the act of June 5th, 1794, c. 226,[(a)] and the power and duty of the proper court of the United States, to restore the prizes made in violation of that act, is clearly recognised. Ibid. To constitute an illegal equipment or augmentation of the force of a vessel, within the territory of the United States, it is immaterial, whether the persons enlisted are native citizens, or foreigners domiciled within the United States. Neither the law of nations, nor the act of congress, recognises any distinction in this respect, except as to subjects of the foreign state in whose service they are so enlisted, being transiently within the United States. Ibid. 366.
During the late war between the United States and Great Britain, a French privateer, called the Invincible, and duly commissioned, was captured by a British cruiser, afterwards re-captured by a private armed vessel of the United States; again captured by a squadron of British frigates; again re-captured by another United States privateer, and brought into a port of the United States for adjudication. Restitution on payment of salvage was claimed by the French consul, on behalf of the owners of the Invincible. A claim was also interposed by citizens of the United States, who alleged, that their property had been unlawfully taken by the Invincible, before her first capture, on the high seas, and prayed an indemnification from the proceeds. Restitution to the original French owner was decreed by the circuit court, which decree was affirmed in this court; and it was determined, that the tribunals of this country have no jurisdiction to redress any supposed torts committed on the high *seas [*73 upon the property of our citizens, by a cruiser regularly commissioned by a foreign and friendly power, except where such cruiser has been fitted out in violation of our neutrality. L'Invincible, 1 Wheat. 233; s.c. 2 Gallis. 29.
See infra, the cases of The Estrella, and The Neustra Senora de la Caradid, in which the same principles which are collected in this note were applied to captures of Spanish property by Venezuelian and Carthagenian privateers, and the property was restored to the original owners, or to the captors, according as the capture had, or had not been made in violation of our neutrality. For the different public acts by which the government of the United States has recognised the existence of a civil war between Spain and her American colonies, see Appendix, Note II.
[(a)] This act was made perpetual by that of April 24th, 1800, c. 189, which was repealed, and all laws respecting our neutral relations were incorporated into one by the act of the 20th of April 1818, c. 93.