21 U.S. 108
 5 L.Ed. 574
 8 Wheat. 108
 LA NEREYDA.
The Spanish Consul, Libellant.
 March 8, 1823
 
 1
 APPEAL from the Circuit Court of Maryland.
 
 
 2
 This was an allegation filed by the Spanish consul against the brig Nereyda, a public vessel of war belonging to the king of Spain, stating, that the vessel had been captured by the privateer Irresistible, John O. Daniels, master, in violation of the laws, treaties, and neutral obligations of the United States. The claim given in by Henry Child, as agent in behalf of the claimant, Antonio Julio Francesche, set up a title in him acquired under a sale in pursuance of a sentence of condemnation, as prize to the captors, pronounced by the Vice Admiralty Court at Juan Griego, in the island of Margaritta, in Venezuela. The capture was made under an alleged commission from Jose Artegas, chief of the Oriental Republic of Rio de la Plata, and the prize carried into Juan Griego, as to a port of an ally in the war, for adjudication. The capturing vessel was built, owned, armed, and equipped in the port of Baltimore, and having provided herself with the commission, sailed from that port on a cruize, and captured the Nereyda at sea, in the year 1818. The sentence of condemnation was pronounced, and the alleged sale took place, in March, 1819, and the name of the captured vessel having been changed to that of El Congresso de Venezuela, and a commission obtained for her as a privateer from the government of Venezuela, she set sail for Baltimore. under the command of Henry Childs, who was the original prize master, where she arrived, and was libelled as before stated. It appeared in evidence, that the vessel had continued, from the time of the capture, under the direction and control of Daniels and Childs, both of whom were citizens of the United States, and domiciled at Baltimore. No bill of sale to Francesche was produced, and no other evidence of his purchase, except a certificate from the auctioneer. A decree of restitution to the claimant was pronounced in the District Court, which was affirmed, pro forma, in the Circuit Court, and the cause was brought by appeal to this Court.
 
 March 13th, 1822.
 
 3
 The cause was argued, at the last term, on the original evidence, by Mr. Harper and Mr. D. Hoffman, for the appellant, and by Mr. Winder, for the respondent.
 
 
 4
 Mr. D. Hoffman, for the appellant, contended, (1) That the Court is competent to restore this property to the appellant, by the general principles of the jus gentium, without any reference to the proof, that the neutrality and laws of this country have been violated by the captors, but on the sole ground, that this taking on the high seas was not jure belli, but wholly without commission, as Jose Artegas does not represent a State or nation, or a power at war with Spain. That the principles established by cases recently decided in this Court, do not impugn the doctrine contended for, as they occurred in the case of commissions granted by such of the South American provinces as our government, in the opinion of the Court, had recognised to be engaged in a civil war with Spain. That our government, and this Court, having, in no instance whatever, recognised Artegas as engaged in a war with Spain, he is as incompetent to grant commissions of prize, as any other individual in the Spanish provinces. That this Court, therefore, as an Instance Court, will decree restitution and damages, as in ordinary cases of maritime tort.
 
 
 5
 2. That the neutrality and laws of this country having been violated by the captors, this Court will decree restitution on that ground, even if the authority under which they acted were, in other respects, fully competent.
 
 
 6
 3. If the Court has the power to restore this property, either on the ground of the total inability of Artegas to issue commissions of prize, or in vindication of our violated laws and neutrality, it will look behind the condemnation of any Court for the existence of these facts, and if they be found to exist, will wholly disregard the condemnation, and consider it rather as an aggravation than an extenuation of the wrong.
 
 
 7
 4. That this Court, in restoring this property, on the ground of violated neutrality and laws, will not disturb the decree of condemnation, or in any degree impugn the received doctrine of the conclusiveness of admiralty decrees, as said condemnation was made without any reference to our laws, or inquiry as to the ownership or equipment of the privateer.
 
 
 8
 5. That there is no sufficient proof of the condemnation, which is relied on; that this Court will require the exhibition at least of the libel, in order to disclose the grounds of the prize proceedings.
 
 
 9
 6. That the Vice Admiralty of Juan Griego must be regarded by this Court as wholly incompetent to pass on this prize, first, because there is no evidence whatever of an alliance between Venezuela and the Banda Oriental; and, if the alliance were proved, then, secondly, because this sentence was passed by the Court of an ally, and not by a Court of the belligerent captor sitting in the country of an ally.
 
 
 10
 7. That the evidence of the claimant's purchase is not sufficient; and, if it were, his title would be affected by those infirmities which attached to the right of the captors.
 
 
 11
 8. That under the circumstances of this case, the new commission granted to the Nereyda, by the government of Venezuela, after its condemnation, and the alleged purchase of it by Francesche, can afford it no protection in this Court; that the doctrine of the immunity of sovereign rights, when it has an extra-territorial operation, is altogether inapplicable to the present case.
 
 
 12
 9. That as the evidence in this cause connects the Court of Juan Griego, its proceedings, and the commission of the Nereyda, with the manifest violators of our laws of neutrality, and the treaty with Spain, and evinces the whole to be a congeries of frauds practised on our laws by our own citizens, aided and sustained by foreigners, this Court will maintain the integrity of those laws, and pay no more regard, and, perhaps, less, to the commission, than to the condemnation.
 
 
 13
 And, first, as to the effect of the commission: most of what has already been submitted to the Court as to the inefficiency even of a genuine sale of such a privateer to the government of any of the South American provinces, and the inability of a condemnation, even of a competent Court, to deprive this tribunal of its restoring power, will apply with equal, and perhaps greater force, to the immunity claimed for this prize from the commission with which she is now clothed.
 
 
 14
 If this immunity be allowed, it must be on the ground, that the sovereignty of Venozuela would be improperly subjected to judicature, and that this commission imparts to the vessel the same privilege from arrest, or detention, which is due in certain cases to a sovereign, or his ambassadors. This is founded wholly on an assumption, first, of the fact, that sovereignty is by this proceeding brought into judicature; and, secondly, of a principle, that sovereignty cannot, in any case, be thus dealt with; both of which, it is presumed, are untenable. We contend, that the restoration of this prize, notwithstanding commission, would, in no degree, affect the rights or dignity of the government of Venezuela; and that if our laws have been violated, the power of restitution cannot be impaired, even if the rights of sovereignty were implicated; that the government of Venezuela, even if regarded, in all respects, as that of a free and independent State, has no sovereign rights in this country, when they come in collision with our own; that all sovereignty is, in its nature, as a general rule, local, and that its extra-territorial operation is to be found only in a few cases of exception to that rule.
 
 
 15
 This commission, like the condemnation, is a sovereign act, good for some purposes, and wholly inoperative as to others. The commission would justify the capture of Spanish property; that power this Court cannot call in question; but the commission is not good to disarm this Court of a power which it would otherwise possess, viz. of restoring this vessel, because gained by the unlawful use of American means. The taking of this vessel, by our citizens, per se, rendered her justiciable in this Court; she is liable to the jurisdiction of American admiralty tribunals, at any remote period, and into whatsoever hands she may have come, whether by condemnation, bona fide sale, or otherwise; and though, in the exercise of this power, such condemnation, sale, or commission, may be rendered (in a degree) inoperative, this is only an incidental or collateral effect; the Court would not directly impugn either; it merely restores the possession to those from whom, quoad this country, it had been illegally wrested. And if subsequently the condemnation, sale, or commission, could benefit those claiming under them, or either of them, this Court would have no power to disturb such possession or title.
 
 
 16
 The commission which has been given to this prize, is not sustained by any principles similar, or equivalent to those on which the force of condemnations ordinarily rests. It can seek no aid from the doctrine of comity; it can claim no exemption from the binding operation of an actual, or supposed notice of a proceeding, in which all the world is a party; it can demand no privilege from the doctrine of the absolute coequality of all nations. On what principle, then, can the commission shield the vessel from the power of this Court? These cruizers bear the flag, and are clothed with the commissions of the country of their adoption; and yet we know, that this Court, in vindication of the laws of the land, would condemn them, on informations filed under the neutrality acts; and this, too, even were they public, or national vessels of war.b Sovereignty, no doubt, would be as much implicated in the one case, as in the other. It may, however, be said, that the Nereyda never violated the laws of this country, but that it is the capturing vessel which is in delicto; true; but the very ground on which the res subjecta is now claimed, is, that it never vested in the captors, as far as concerns this country. The innocence of the res capta, and the illegal means used for its acquisition, are the very grounds of our libel, and the foundation on which the power of this Court reposes. If the capturing
 
 
 
 b
 1 Wheat. Rep. 253. vessel has broken our laws, and the fruit of its illegal act be within the reach of this Court, no power is competent to arrest its arm. If a commission or condemnation of the prize could effect this, legislation would be worse than vain; it would be clothing foreign powers with the right of dispensing with our most solemn, important, and penal laws; and, in the present case, it would be yielding to an unknown, undefined, self-created power, not only the rights of nations in their fullest extent, but the privilege of seducing our own citizens to the violation of our laws; and this, too, with perfect impunity, as the personal sanctions of the laws are not only extremely difficult to be enforced, but there is no occasion for the offenders to come within the reach of our Courts.
 
 
 
 17
 The cases of the Exchange,c and the Cassius,d will probably be relied on, as establishing the doctrine that the commission conferred on this vessel by the government of Venezuela, as the sovereign act of a State or nation, so effectually screens the vessel from judicial cognizance, that this Court dare not examine into the cause, but must leave the vessel in the undisturbed possession of those holding the commission. If we analyze this celebrated case of the Exchange, and collate its facts and principles with that now under adjudication, we shall find them to stand on grounds essentially different:
 
 
 18
 1. The seizure of the Exchange was made by the sovereign power of France, from an American
 
 
 
 c
 7 Cranch, 116.
 
 
 d
 3 Dall. 123. citizen who had violated his neutrality, and had thereby become quasi an enemy of that country. 2. The seizure was in the exercise of what was claimed by France as a belligerent right. 3. The Exchange, when she returned into our waters, was actually and bona fide a public vessel of war, held by the Emperor Napoleon, jure coronae, and bore the flag and commission of a national ship of war. 4. The Exchange was in the possession of a sovereign who claimed a title in her, and who had done no act by which he could be subjected to judicature. 5. The case of the Exchange rested on the personal character and immunity of sovereigns, and an immunity was claimed for this vessel only as extensive as that which is allowed in the three cases, of the sovereign himself, his ambassadors, and his armies in transitu. 6. The Exchange entered the port of Philadelphia in distress, and sought an asylum bona fide. During this time she demeaned herself with strict propriety, and no act was done manifesting a consent to submit to judicature, nor by our government to exact it. 7. The libel against the Exchange involved the question of sovereign title as well as possession. It was a petitory suit, of which this Court could have no jurisdiction whatever. 8. There was a suggestion by the law officer of the government, on behalf of the French sovereign, and the case was wholly coram non judice, even if the Exchange had not been a national vessel of war. 9. The Exchange was not seized on the high seas; it was a seizure within a port of the French empire, by order of the sovereign, under his Rambouillet decree. There was, therefore, no case within the admiralty. The taking was neither a capture, nor a maritime tort; the Court was, consequently, compelled to leave the possession undisturbed. 10. Its being, at the time of the seizure, American property, could in no way invest this Court with the power of restitution, even had it been a maritime seizure jure belli. The legality of all captures is to be judged by the Courts of the captor, unless in the two excepted cases of a violation of our territorial limits in effecting the capture, and equipment, ownership, or augmentation of the force of the vessel in this country. The Exchange was embraced by neither exception.
 
 
 
 19
 Setting aside the question of the sovereign's title, the case of the Exchange presented nothing more than the ordinary case of an American vessel, which, after being seized jure belli, for a violation of her neutrality, returned to this country; the legality of which seizure, it must be admitted, belonged exclusively to the Courts of France. The violation of her neutrality rendered her quoad hoc a belligerent. Nay, the very suggestion filed by the attorney general, was avowedly for the purpose of maintaining our neutrality inviolate; and although the decree to which she had rendered herself obnoxious, might have been a most arbitrary, and even wanton departure from the law of nations. This was not a matter for our Courts, but for our government to judge of, and to remedy; for had the government declared the Rambouillet decree contrary to the law of nations, still, this Court could not have restored the Exchange.e This principle alone would have justified the Court in refusing to restore the Exchange to its former owner. The case of the Exchange was made to rest on two distinct points, either of which was sufficient to decide the cause. First, whether the Court could restore American property, which might have been unjustly or illegally seized by a foreign government. This was, in truth, the only essential point. The cases of the Betsey,f Del Col v. Arnold,g and some others, seemed to sanction the right of restoring, simply on the ground of its being American property. A second question was, therefore, made, which, though but auxiliary, assumed, in the course of the argument, the chief importance. It was contended, that as the Exchange was now the property of a sovereign, which had been admitted into our country by implied consent, and which, during her stay, had done no act to terminate that permission, this Court must regard the vessel as entitled to the same immunity as would be due to ambassadors, or foreign troops passing by consent through our country. Much learning and eloquence were, no doubt, displayed in the argument of this point; but, it is conceived, that had the doctrine, since so clearly laid down in the case of the Invincible,h been at that time as well defined and understood
 
 
 
 e
 Williams v. Amroyd, 7 Cranch, 423.
 
 
 f
 2 Perters's Adm. Dec. 330.
 
 
 g
 3 Dall. 333.
 
 
 h
 2 Gallis, Rep. 36. 1 Wheat. Rep. 238. as it is at present, the case of the Exchange would have been decided without reference to the question of sovereign immunity.
 
 
 
 20
 The following points of comparison occur between the Exchange and the case now under adjudication:
 
 
 21
 1. The Nereyda was not seized by any sovereign power, but by Daniels, a private individual, a citizen of the United States, acting under an authority wholly unknown to this Court, because in no way recognised by this government. 2. The Nereyda never was, and is not at this time, a public vessel of war of the government of Venezuela; but a privateer, the private property of Daniels, and in his, or, perhaps, Francesche's possession. The commission under which she now appears, imports nothing more than an authority in Childs, her commander, to capture Spanish property; but it does not render her national or public property. The commission in the case of the Exchange, on the contrary, was also an evidence or muniment of the sovereign's title. The restitution of the Nereyda would deprive an individual of his possession; but the restitution of the Exchange could not have been effected without judging of the validity of the original seizure, annulling the commission, and pronouncing a sovereign's title wholly void. 3. The Nereyda is expressly claimed on behalf of a private individual. Neither Francesche nor Childs makes any mention of any possession or property being in the government of Venezuela. This proceeding, then, does not call on sovereignty to submit to judicature; and the commission cannot require of us to consider that as national property, which the whole history of the case proves to be a mere private possession. 4. The Nereyda entered our waters voluntarily, and for the express purpose of obtaining an unlawful equipment, and the very persons who brought her here, had violated our laws, and subjected themselves, and the property in their possession, to the jurisdiction of our Courts. No asylum, therefore, was granted to the Nereyda, and her officers and crew. The United States cannot be supposed to have admitted the Nereyda, exempt from all inquiry as to her real character, and as to the conduct of those in whose possession she was found. But the Exchange not only arrived here in distress, and demeaned herself with strict propriety, but those who had her in possession had never violated our laws, nor was she ever capable of restitution by this Court; she entered our ports under an acknowledged and certain immunity. No cession, then, of territorial jurisdiction can be inferred from the entry of the Nereyda into our waters; and her commission, even if it made her a national vessel, would not, under the circumstances of the case, protect her, allowing the doctrine of sovereign immunity its greatest latitude. Sovereignty is essentially local in its operation; the moral equality of all nations establishes this as an aphorism in public law. Beyond a nation's dominions, sovereignty has, ordinarily, no operation; its extraterritorial power is but an exception to a well known rule; and if we for a moment attend to the principle which supports the exception, we shall find it, in all cases, to rest on the consent, express or implied, of that nation within whose territory the immunity is claimed. The three exceptions so forcibly illustrated in the judgment of the Court in the case of the Exchange, show the local nature of sovereignty, and strongly evince the special grounds on which the deviation from the general rule is justified. But even in the excepted cases, if there be not the utmost good faith, if there be any circumstances to negative the implication of consent, or any facts unknown at the time of an express compact, which would have prevented such compact, had they been disclosed, the immunity would at once cease.
 
 
 22
 The claim of immunity for the Exchange, was exacted only to the extent of, and made to rest on those principles which protect from detention or arrest, 1st. a sovereign entering the territory of another; 2dly. ambassadors; and, 3dly. the troops of a foreign prince, to whom a right of passage had been allowed. Now, if a sovereign should enter the dominions of another, without such implied or express consent; or if, after he has entered with consent, he should commit an act malum in se, or against the jus gentium; or if it be discovered that an ambassador had, prior to his appointment, committed some capital offence against the country to which he is sent; or if the troops, in their passage, should violate the rights of persons, or of property—it is presumed neither of them would be shielded or of property—it country.i If this be correct, the commission granted
 
 
 
 i
 4 Inst. 152. 3 Bulst. 28. Molloy, B. 1. ch. 10. s. 12. to the Nereyda cannot, on principle, screen her from the restoring power of this Court. The vessels of all nations, public as well as private, may seek an asylum in our ports. During this, we have, ordinarily, no jurisdiction over them. The consent, however, under which they enter, is always subject to the qualification that they have not previously violated our laws or hospitality, and that they are in no other respect amenable to judicature. If the Nereyda had not been taken by United States' arms, this Court could not have interfered in behalf of the Spanish sovereign, from whom his rebellious subjects had taken her. The commission, then, it is presumed, can no more protect her from the power of this Court, than the solemn and public documents by which an ambassador is made the representative of his sovereign, could shield him from the criminal law of the country in which he resides, and whose laws he had previously violated unknown to that country.
 
 
 
 23
 The libel in this case does not involve the question of title. As relates to Venezuela, even the right of possession of this prize is not implicated. If this were a petitory suit, this Court would disclaim any interference.j But the question simply is, whether those who have gained a possession, or their representatives, by means illegal in reference to our laws, shall be permitted to retain that possession against its original possessors, in the very country whose laws have been violated.
 
 
 
 j
 2 Bro. Civ. & Adm. Law, 110, 113, 114, 115, 117. 7 Cranch, 120, 121.
 
 
 
 24
 The Nereyda being at one time subject to the jurisdiction of this Court, (had she come into our possession,) the Court will not permit that to be done indirectly, which could not be done directly. This contingent jurisdiction can no more be annihilated or impaired by the act of a nation or State, than by an individual. As to this country, the taking was an absolute nullity. There was a deep seated infirmity in the original capture, which could not be cured by the condemnation, nor by Francesche's purchase, even if it had been genuine. For if the condemnation be not sufficient, no act done in execution of that judicial sentence, could be thus operative: debile fundamentum fallit opus; and Francesche could succeed only to the title of Daniels, whatever that was. Nor could the commission rehabilitate or perfect the title. It does not pretend to assert a title in any one, nor does it design to confer a title on Francesche, or to intimate any claim of property in the government granting it. This sovereign act, then, imports nothing further than an authority to that vessel to capture Spanish property.
 
 
 25
 In the case of the Exchange, the prominent difficulty was, that its possessor being a sovereign, could not be brought into Court. But, in the present case, those claiming under the commission, have not only voluntarily appeared and claimed the Nereyda, but they have expressly submitted the case to the jurisdiction of this Court. The claimant asked for, and received the Nereyda on stipulation; this cancels, or waives every objection to jurisdiction, if any existed.k Not that it is meant to assert, in general, that consent can confer jurisdiction; but that wherever a Court has jurisdiction of the subject matter, but not of the person, consent would remove the objection. If, on the other hand, the Court has no jurisdiction over the subject matter, but of the persons only, it would not be competent to act from the consent of the parties. In the case now before the Court, there is no one act of the claimant, or of others, indicating any interest in this proceeding on the part of the government of Venezuela; but the case is impressed throughout with the character of a mere private and individual claim.
 
 
 26
 In the case of the Cassius, a prohibition was allowed on the ground, 1st. That the prize itself had been carried infra praesidia; 2dly. That the question of damages should follow the main question, which belonged exclusively to the Court of the captor; 3dly. That as the Cassius was, and ever had been, the property of a overeign nation, and not a mere privateer, our Courts had no power to make her respond in damages; 4thly. That there was no proof that the commander of the Cassius was an American citizen; 5thly. That the treaty with France gave the exclusive cognizance, in all cases of prizes made by their vessels of war, to the Courts of France.
 
 
 27
 Is there any point in this case which militates against the restitution of the Nereyda? In the
 
 
 
 k
 The Abby, 1 Mason's Rep. 364. 2 Bro. Civ. & Adm. Law, 398. case of the Cassius, the Court very properly deided, that the privateer should not respond in damages for the captured property; as this had been taken infra praesidia capientium, and the Court of the captors having the exclusive right to judge of the legality of the capture, the question of damages should follow the main question. It also assumed the doctrine, which has been subsequently fully established in the case of the Invincible,l viz. that the power of this Court to take the res capta from the possession of a belligerent, and restore it to its former owner, could only be brought into action where the neutrality or territorial jurisdiction of this country had been violated by the captor. The case of the Cassius is, in all its points, good law; it is nothing more than the ordinary case of calling on this Court to decree damages for an illegal capture of American property; no one will pretend to say, that this can be done, unless the Court acquires a jurisdiction by reason of the existence of either of those facts which take the case out of the control of the general rule, which gives to the Courts of the captors the sole right of judging of the validity of all captures. American ownership in the thing captured is not sufficient per se, and in the case of the Cassius no other fact appeared in proof. Further; if we advert to the fact, that the Cassius was subsequently prosecuted on an information for an illegal outfit, which, on that proceeding, was proved,
 
 
 l
 1 Wheat. Rep. 238. and she condemned, maugre her commission,m the case of the Cassius, on the civil proceeding, cannot be regarded as any authority to establish the doctrine of sovereign immunity, when the rights of two sovereigns come in collision.
 
 
 
 28
 Mr. Winder, contra, contended, 1. That there was no competent claimant before the Court. The vessel libelled originally belonged, as was asserted, to the king of Spain, and was libelled by the Spanish consul, who cannot be considered by this Court as authorized in his general character to appear for his government, when its sovereign rights are drawn in question in our tribunals. He must show some special authority for this purpose.n
 
 
 29
 2. The capture was made jure belli, under a regular commission from Artegas, the chief of one of the South American provinces, engaged in the present war between Spain and her colonies. The existence of this civil war is notorious. It has been recognised by various acts of our government; and the consequent right of all the parties engaged in it, to carry on hostilities against each other, has been repeatedly admitted by this Court, and is laid down by all the text writers on the law of nations. The Oriental Republic, or Banda Oriental, is that portion of the ancient vice-royalty of La Plata, lying between the river Uruguay and Brazil; which, for a long period, and at the time
 
 
 
 m
 1 Wheat. Rep. 253.
 
 
 n
 The Anne, 3 Wheat. Rep. 435. the present capture was made, carried on hostilities both against its parent country, Spain, and against Portugal, independent of the government established at Buenos Ayres. This fact is stated in the President's message of the 17th of November, 1818, and in the reports of our commissioners, transmitted with it;o and is sufficient to authorize the Court to allow to Artegas all the rights of war, according to the principles already settled as applicable to this subject. It is impossible to make any intelligible distinction, in this respect, between the different governments which have successively sprung up in different parts of South America. The rights of war must be allowed to all, or to none. Their existence as governments de facto, is matter of history and public notoriety; and the United States have since acknowledged the independence of all of them as they now exist, without pretending accurately to adjust their conflicting claims of territorial jurisdiction among each other.
 
 
 
 30
 3. The capture having been made under a lawful commission, was carried into a port of Venezuela, an ally or co-belligerent with the Banda Oriental in the war with Spain, and there condemned as prize to the captors, in the regular Court of the ally. The present claimant asserts his claim as a purchaser under that sentence of condemnation. The fact of the connexion between the different Spanish provinces in the war with the parent country, is mentioned by the President
 
 
 
 o
 4 Wheat. Rep. App'x. Note II. p. 23. in his different communications to Congress, and he has the exclusive authority of determining the relations of foreign States. There is no doubt, that a valid condemnation may be pronounced in the Court of the captor's country, where the prize is lying in the port of an ally in the war. And if his ports may be used for this, and all other hostile purposes, it is not perceived why the aid of his Courts may not be imparted for the purpose of consummating that title which is acquired by capture, and bringing infra praesidia. Indeed, it seems to be settled by the authority of text writers on the law of nations, and by express adjudications, that this may be done.p It must be mere matter of arrangement and mutual convenience between the co-belligerents themselves, and no neutral, or other nation, can have any right to complain. The validity of the capture is inquired into by a Court of prize, having an inherent capacity to make the investigation, and to do justice to the claimants as well as the captors. Such was our own practice during the war of the revolution, when Congress authorized our prize Courts to condemn prizes taken by French cruisers, and brought into the ports of the United States.q But even supposing the Court of Venezuela not to be competent to adjudicate on the capture by its ally, yet the thing taken being once in its possession, and being the property of Spain, its enemy, it
 
 
 p
 2 Brown's Adm. & Civ. Law, 257-281. Oddy v. Bovill, 2 East's Rep. 479.
 
 
 q
 5 Wheat. Rep. App'x. 123. might proceed to condemn it as such, and the condemnation must give a valid title against all the world.
 
 
 
 31
 4. The captured vessel having been thus condemned as prize, was sold, and fitted out as a privateer under a commission from the government of Venezuela. It is insisted, that this condemnation, and the commission thus obtained, are alone sufficient to prevent the Court from inquiring into her former history. The vessel comes into our ports under the general license which both South American and Spanish cruisers enjoy of frequenting them; and so long as she does not abuse that hospitality, by augmenting her force contrary to our laws, has a right to remain, and depart at pleasure. This was the principle established in the case of the Exchange. It was not upon the ground, that the vessel had become the property of the French emperor by a regular condemnation as prize, but that she bore his flag and commission, and coming into our ports under a general permission, was not amenable to the jurisdiction of our Courts, any more than that sovereign himself, or his ambassador, would have been. Whether the ship be a public, or a private armed vessel, can make no difference. It is sufficient that she bears the commission of the State, and is engaged in the service of the State. To exert any jurisdiction over her, is to exert a jurisdiction over the sovereign rights of that State, of whose military force she constitutes a part, and, from the nature of the present war, an important part. You may, indeed, by a prospective regulation, revoke the permission which you have granted to the cruisers of the South American States, provided your act of revocation be impartial, and extend to those of Spain also. But you cannot violate in a particular case the permission you have already granted, and draw to your judicial cognizance the sovereign rights of a State, which is coequal, in the view of the law of nations, with the oldest and proudest sovereignty in the world.
 
 
 32
 The learned counsel, also, referred to his arguments in other analogous cases before the Court at the same term, which will be found reported in those cases.r
 
 
 33
 Mr. Harper, for the appellant, in reply, notice 1. The preliminary objection which had been urged on the part of the respondent, that the Spanish consul had no competent authority to institute the present proceeding.
 
 
 34
 This objection admitted of several answers. In the first place, it was to be recollected, that it was not the sovereignty, or the sovereign rights of the Spanish government, that were here in question. It was a mere right of property, held and claimed by the king, in trust, indeed, for the nation, but still a right of property. Some doubts had been raised, how well founded it was not then necessary to inquire, whether a sovereign could be brought into judicature to defend any of his rights: but surely it had never been doubted, that he
 
 
 
 r
 The Santissima Trinidada, (ante, Vol. VII. p. 290.) The Grand Para, (id. p. 484.) The Arrogante Barcelones, (id. p. 498, 516.) might go there if he thought fit, to assert his rights of property. This was the daily practice of our own, and every other government, that respected the laws, and did not act in all cases by its arbitrary will. If the king of Spain could appear voluntarily in a Court of justice, to assert his rights of property, surely he might appear by his agent, his proctor, or his attorney. The consul is the general agent for asserting in Courts of justice the rights of his countrymen, and of his government, as far as they related to property. Here the consul claims; not, however, in his own name, or for himself, but in the name, and for the rights of his government. As to the case of the Anne, which has been cited on the other side,s the claim was not founded on a right of property, but of violated sovereignty. During the war between the United States and Great Britain, an American privateer had taken a British vessel on the coast of Hispaniola, and, as was alleged, within the Spanish jurisdiction. Spain was neutral; and there being no acknowledged Spa nish minister, the Spanish consul interposed a claim, to protect the neutral rights of his government, and complain of their violation. He had no extraordinary powers; and the Court decided, that for this purpose his ordinary powers were not competent. But surely it does not follow from this decision, that if the vessel taken had been a public ship of Spain, he might not have interposed a claim for the property; for he is peculiarly intrusted with the rights of property, while those of sovereignty are confided to the ambassador or public minister.
 
 
 
 35
 But, in the second place, if the public minister of Spain alone can act, in a matter of this kind, he has acted here. An express written authority has been produced, from him to the consul, to claim in this very case for the king of Spain. Surely if the king of Spain may come into Court to prosecute his rights, he may come by his attorney, his proctor, or his solicitor, as the case may require. The Canton of Berne once filed a bill in the English High Court of Chancery;t and surely the Canton of Berne must have appeared by a solicitor. And how was this solicitor appointed? Unquestionably as the proctor was in the present case, by the accredited minister of the sovereign.
 
 
 36
 2. He then proceeded to consider the principal questions in the cause, the first of which related to the validity of the commission under which the capture complained of was made, which he contended was invalid, and did not authorize the capture. The commission relied on is from Jose Artegas, styling himself 'chief of the Oriental Republic,' and 'protector of the Orientals;' and the question is, whether any such republic, community, or government, is known to this Court. This depends upon their recognition by the government of this country, through the President, its constitutional organ for such purposes. This recognition certainly need not include Artegas by name, as the chief of the supposed republic, government, or community; because, when once their existence is properly made known to this Court, the persons who from time to time act as their chief officers, must be taken to be so. But the government itself must have been acknowledged by the proper authority, before its existence can be noticed, or its acts treated as valid, by this Court. The question, then, is, has any such government as that of 'the Oriental Republic,' or 'the Orientals,' been recognised by the government of the United States? For the decision of this question we must refer to the various acts of recognition which have been done by the President.
 
 
 37
 The only message of the President to Congress, which contains a distinct recognition of the different South American governments, is that of the 17th of November, 1818.u It states, 'that the government of Buenos Ayres declared itself independent in July, 1816, having previously exercised the powers of an independent government, though in the name of the king of Spain, from the year 1810. That the Banda Oriental, Entre-Rios, and Paraguay, with the city of Santa Fee, all of which are also independent, are unconnected with the present government of Buenos Ayres; that Chili has declared itself independent, and is closely connected with Buenos Ayres; that Venezuela has also declared itself independent, and now maintains the conflict with various
 
 
 
 u
 A Wheat. Rep. App'x. Note II. p. 24. success; and that the remaining parts of South America, except Monte Video, and such other portions of the eastern bank of the La Plata, as are held by Portugal, are still in the possession of Spain, or in a certain degree under her influence.'
 
 
 
 38
 Here we find various countries distinctly enumerated, of some of which the governments are noticed, but no mention whatever of the 'Orientals,' or the 'Oriental Republic.' A country called the 'Banda Oriental,' indeed, is mentioned, and we may conjecture, but are no where informed, that it constitutes the whole, or a part of this supposed republic. It is mentioned in connexion with two other countries, called 'Entre-Rios,' and 'Paraguay.' Do they, also, form parts of 'the Orientals,' of whom Jose Artegas is the protector; or of the 'Oriental Republic,' of which he claims to be the chief? We are no where informed by the President; and although it might be plausibly conjectured, yet we know the fact to be otherwise. Paraguay, we know, historically, to be altogether separate from the Banda Oriental, and to have a chief of its own, one Francia, who is said to style himself 'consul,' and to conduct his government according to the forms of the Roman Commonwealth. Venezuela is spoken of in the message as a distinct community, and we know it by that name. Chili is mentioned in the same manner, as a distinct community of that name, and, consequently, capable of having a government. Three other countries, or communities, are named in connexion; but we are not informed whether they constitute the territory of one government, of two, or of three; and no mention whatever is made of any such government, community, or people, as the 'Orientals,' or the 'Oriental Republic.'
 
 
 39
 We are, then, left wholly in the dark by the President on this point; and we cannot look beyond his messages for information, which he alone is authorized to give. We cannot look to the reports of the commissioners for the recognition of this government. This recognition appertains to the President alone, as the constitutional organ of the nation for all such purposes. He has, indeed, thought fit to lay before Congress the reports of the commissioners, as his justification for the step which he took, in recognising some of these governments, and for declining to recognise others. But he cannot have intended by this act, to transfer the decision of this great question of national policy to this Court, or to any other department of the government; and if he had intended to do so, it was not in his power. And if we look to the reports of the commissioners, we shall find abundant matter to justify the President in forbearing to recognise this pretended government. These reasons exist in its unsettled, irregular, and ephemeral character. We were fully informed, by these reports, of the existence and pretensions of Artegas, of the nature of his government, and the countries over which it claimed to extend. One of the reports, that of Mr. Rodney, speaking of the people of the Banda Oriental, and Entre-Rios, says, that they 'have been compelled to give up every thing like civil avocations, and to continue without any regular kind of government, under the absolute control of a chief, who, whatever may be his political principles or professions, in practice concentrates all power, legislative, executive, and judicial, in himself.'
 
 
 40
 3. But, admitting the commission to be valid, there was no valid condemnation of the property captured under its authority.
 
 
 41
 The paper produced as a condemnation, purports to be the sentence of a Prize Court of Venezuela, sitting at Juan Griego, or Gregorio, in the island of Margaritta, within the territory of that republic. It is objected to this condemnation, first, that it is not proved; and, secondly, that it was pronounced by a Court which had no jurisdiction.
 
 
 42
 The objection to the proof rests on two grounds. In the first place, the sentence is not certified under the seal of any Court, or by any person who appears, or is stated or proved to be, the officer of any Court. The person who certifies this sentence, is stated, and proved to be, 'the notary of the Marine at Juan Griego, in Margaritta;' but we are no where informed, that he is charged with, or executes the functions of clerk or register of the Admiralty Court, whose sentence this purports to be, or that he is in any manner employed by it, or authorized to authenticate its proceedings.
 
 
 43
 In the next place, this sentence, admitting it to be properly authenticated, appears alone. It is unaccompanied by any part of the proceedings in the cause in which it purports to have been pronounced. Before the sentence, decree, or judgment of any Court whatever, can be given in evidence, it must be shown, that it was pronounced in a cause depending before that Court, and within its jurisdiction. This is a universal rule, and applies, for the plainest reasons, to the decisions of Prize Courts, and of all other Courts of justice. Without the production of the proceedings, it will always be impossible to ascertain whether the Court had jurisdiction of the case; a point always, and in all cases, examinable, and which must always be established, before the sentence, judgment, or decree, can be given in evidence. For this reason, the libel and claim, in admiralty and prize cases, must be produced, in order to let in the sentence. Not being produced here, the sentence, however well authenticated, must be disregarded.
 
 
 44
 But if received, it can produce no effect; because, it appears, on its face, to be the sentence of a Court which had no jurisdiction in the case which it undertook to adjudicate.
 
 
 45
 The commission under which the vessel and cargo in question were captured, as prize of war, was granted by Artegas, as chief of the Orientals, and protector of the Oriental Republic; a government which, if it have any such existence as can be noticed here, is entirely distinct from that of Venezuela, in the Prize Court of which, sitting at Juan Griego, in the island of Margaritta, the condemnation took place. But, it is said, that Venezuela was the ally of Artegas in the war; and that the Prize Court of an ally may condemn. We deny both these positions.
 
 
 46
 How does it appear, that Venezuela was the ally of Artegas? The fact is not stated by the President in any of his public communications to Congress. Nor do the commissioners to South America, whose reports he communicated to the legislature, say any thing of such an alliance, or any thing from which it must, or even could be inferred. The President, indeed, states to Congress, as the commissioners had done to him, that both Artegas and Venezuela were at war with Spain. But, does it follow, that they were in alliance with each other? We have lately learned, that war has broken out between the Turks and the Persians. It may very soon break out between Russia and the Turks. Will the Russians and Persians, in that case, be ipso facto allies in the war against Turkey? Alliance means a connected union of efforts and means; and not merely an accidental coincidence of objects. It follows, that the President, by declaring to Congress that Artegas and Venezuela were both engaged in war with Spain, did not declare that Artegas and Venezuela were allies. But, admitting that he had declared it, still his declaration would not be competent evidence of such a fact. When the question relates to the existence of a government, it is proper to refer it to the decision of the chief magistrate, who is intrusted by the constitution with the care and management of our relations with other countries and governments; he must, of necessity, therefore, be constituted the judge, and the sole judge, of the fact of their existence, upon which the exercise of these important functions must depend. As these relations, moreover, must often depend on the state of peace or war in which foreign governments may be, as it respects each other, it may be proper that the President should be constituted, for many purposes, the judge, and even the sole judge, of the existence of a state of war between certain nations; because, out of such a state may grow very important relations between us and them. But what relations can arise out of the fact of their being allies in the war, or each carrying it on separately, by his separate counsels and means? None whatever. It is a mere matter of fact, which, like any other matter, may affect the rights or interests of individuals, but cannot, in any way, become a public concern. Those, consequently, who may wish to set it up, in the course of a judicial proceeding, as the foundation of any right or claim, must prove it, as every other fact is proved. As well might it be attempted to prove, by an executive communication, the fact of capture, or of spoliation of papers, or any other fact on which either party in a prize proceeding might rely, as this fact of an alliance between Artegas and Venezuela, in the war against Spain.
 
 
 47
 Admitting it, however, to be proved, it immediately brings up the second question, whether the Prize Courts of one ally are competent to take cognizance of captures made under commissions from the other. We insist that they are not, according to the best established principles of prize law.
 
 
 48
 In this opinion, the most eminent advocates, the soundest elementary writers, and the highest judicial tribunals, with one voice, unite. They all lay it down as an elementary principle, universal in its application, and subject to no exception, that the question of 'prize, or no prize, belongs exclusively to the Courts of the captors' country.' In the case of the Invincible,v that most eminent and distinguished advocate, now unhappily no more, who so long adorned and enlightened this Court, and whose opinions had almost acquired the authority of judicial decisions, treats this rule as an axiom, about which there could be no dispute. Mr. PINKNEY there says, that 'if there be any rule of public law better established than another, it is, that the question of prize is solely to be determined in the Courts of the captors' country. The report on the memorial of the king of Prussia's minister, refers to it as the customary law of the whole civilized world. The English Courts of prize have recorded it; the French Courts have recorded it; this Court has recorded it. It pervades all the adjudications on the law of prize, and it lays as an elementary principle at the very foundation of that law.'
 
 
 49
 The judgment of this Court, in the same case, fully supports the doctrine. It speaks of a sentence as prize under a commission from a power
 
 
 
 v
 1 Wheat. Rep. 246. at war, as the 'act of the sovereign;' as entitled to exemption from scrutiny, 'except in the Courts of that sovereign;' and as not subjecting the captors to any question whatever in any other Court, till those of his sovereign shall have decided, that the seizure was not authorized by the commission. It expressly asserts, that 'the exclusive cognizance of prize questions is yielded to the Courts of the capturing power;' and admits this exclusive cognizance as a general principle.
 
 
 
 50
 So, in the case of the Estrella,w the Court says: 'we have been told, as heretofore, that to the Courts of the nation to which the captor belongs, and from which his commission issues, exclusively appertains the right of adjudicating on all captures and questions of prize. This is not denied, nor has the Court ever felt any disposition to intrench on this rule; but, on the contrary, whenever it occurred, as in the case of the Invincible, it has been governed by it.' It is stated to be a rule 'well established by the customary and conventional law of nations;' and the reasons on which it rests are stated in a clear and satisfactory manner. The rule is thus placed on three grounds: (1.) The dignity of the sovereign who grants the commission; which would be impaired, if any tribunal but those authorized by himself were permitted to take cognizance of the acts done under that commission; in other words, if any one but himself were allowed to superintend the conduct of his agents and officers;
 
 
 
 w
 3 Wheat. Rep. 308. (2.) The efficient restraint and control of those officers and agents; to whom a power most liable to abuse is confided by the prize commission; and, (3.) The responsibility of their sovereign and nation, for the acts of unlawful violence which they may commit against neutrals, should those acts be sanctioned by their own government, through its Prize Courts. Undoubtedly, all these reasons, and especially the two first, require, that the cognizance of questions of prize should be confined exclusively to the Courts of the captors' country; and these reasons apply as strongly to the Courts of an ally, as to those of a neutral. The Courts of the ally, like those of the neutral, are destitute of the means of inflicting punishment on the captor, if, in making the seizure, he have violated the instructions of his government, acted contrary to its general policy, or exceeded the authority conferred by the commission. Equally with the Courts of a neutral, they are without the means of ascertaining what was the policy of the commissioning government, or its general rules and regulations, or what particular instructions accompanied the commission. It is the practice of every government to require sureties from those to whom it grants commissions of prize, for their proper conduct under the commission, and for the observance of their instructions. These sureties must reside in the country where the commission is granted. Consequently, they must be out of the reach of the government and Courts of an ally, as much as of a neutral; and, consequently, the security must be wholly unavailing, if the prizes made under the commission, or by colour of it, may be carried into the ports of an ally, and adjudicated in his Courts. Not being able to reach the sureties, they would be equally unable to reach the property of the principal offender, which would, also, be in his own country. No decree for damages, or even for costs, however flagrant the case might be, could be enforced against his sureties, or his property. Nothing would be left but the imprisonment of his person; and, as he would have offended against no law of the ally, would have infringed none of its orders or instructions, it would be extremely doubtful, at least, how far any penal proceedings could be supported against his person. All that could be done, would be, to rescue his illegally acquired booty from his grasp, by a sentence of restitution. It is easy to see how utterly inadequate this remedy must often prove, and how greatly the temptation to take the chance of succeeding in an illegal and unauthorized seizure must be increased, by such a state of impunity.
 
 
 
 51
 It cannot escape observation, that no where, by no writer or advocate, nor in any adjudged case, is any distinction taken, or hinted at, between the case of an ally, and that of a neutral, in the application of this rule. It is every where laid down absolutely, and without exception; and in a very recent case, the Josepha Secunda,x it is taken for granted by this Court, and forms the basis of its decision.
 
 
 
 x
 5 Wheat. Rep. 358.
 
 
 
 52
 If we advert to the foundation of the prize jurisdiction, we shall find reasons equally strong, for confining it exclusively to the Courts of the captors' country. This jurisdiction is declared by this Court, in the case of Hudson v. Guestier,y to be founded entirely on the 'possession' of the res capta. 'The seizure vests the possession in the sovereign of the captor, and subjects the vessel to the jurisdiction of his Courts.' And, again; 'possession of the res by the sovereign, has been considered as giving jurisdiction to his Courts.' Now, let it be asked, who had possession of the Nereyda while she lay at Juan Griego? Certainly not the government of Venezuela; but that of Artegas, through its agent and officer, the commander of the capturing vessel. This Court asserts most positively, in the case just cited, 'that the possession of the captor is, in principle, the possession of his sovereign.' They add, 'he, the captor, is commissioned to seize in the name of the sovereign, and is as much an officer appointed for that service, as one who, in the body of a county, serves a civil process.' Then the possession of the res capta was in the government of Artegas; and as it is the possession of the res by the sovereign that gives jurisdiction to his Courts, it follows inevitably, that the Courts of Venezuela, the government of which had no possession of the captured property, could take no cognizance of the capture; and, consequently, that the sentence of the Court of Juan Griego is
 
 
 
 y
 4 Cranch's Rep. 296, 297. void, for want of jurisdiction in the Court by which it was pronounced.
 
 
 
 53
 Let it not be imagined, that the possession was altered, or in any manner affected, by the bringing of the captured property into the port of the ally. This Court has emphatically declared, in the same case before cited, that 'the sovereign whose officer has, in his name, captured a vessel as prize of war, remains in possession of that vessel, and has full power over her so long as she is in a situation in which that possession cannot be rightfully devested.' The same doctrine is asserted by all the Judges, in the case of Rose v. Himely,z although there was much difference of opinion among the Judges on other points. Could, then, this possession have been rightfully devested by the government of Venezuela, within whose territory the captured vessel had been brought? In the case of a neutral territory, this Court has expressly adjudged, in Hudson v. Guestier,[1] that it could not. Upon what principle, then, could it be devested by the government of an ally? Ought not the captor to have as much immunity, as much safety, as many privileges in the ports of his friend and ally, his co-belligerent, as in those of a mere neutral? How could he be deprived of the possession? It could only be by an act of violence; and that, ex vi termini, would be wrongful. So far from being rightful, it would be an act of hostility and war.
 
 
 54
 But might not the captor, it may be asked, part
 
 
 
 z
 4 Cranch's Rep. 268. from his possession, and transfer it to the sovereign of the ally, so as to give jurisdiction to the Courts of the latter? 1 answer, that he could not; because, the possession belongs to his sovereign, and not to him. He is merely the agent of the sovereign, for taking and holding the possession; and having no authority to transfer the possession, he could not rightfully transfer it, so as to affect the right of his sovereign, to whom it belongs. It would be a breach of faith and duty, in him, to make the transfer; and to accept it would be a wrongful act on the part of the allied sovereign, upon which, according to a universal principle of law, no right could be founded. The captor, it is true, has an interest in the prize, by the grant of his sovereign; but, until a legal condemnation, that interest is inchoate and contingent. In the mean time, he has no power over it, except that of conducting it into a place of safety, and keeping it safely, till it can be brought to adjudication in the Courts of his sovereign.
 
 
 
 55
 The treatise of Dr. Brown on the Civil and Admiralty Law,[2] and the case of Oddy v. Bovill, in the English Court of K. B.,[3] have been cited on the other side, to show that the Courts of one ally may take cognizance of prizes made under the commissions of the other. But Dr. Brown cites no authority, and offers no reasons in support of his doctrine; which is evidently a mere mistake, arising from his having confounded the Courts of an ally with Prize Courts of the capturing power, sitting within the territory of his ally. This was the case in Oddy v. Bovill, and in the cases there cited from Robinson's Reports. The case of Oddy v. Bovill related to a Danish vessel, captured by the French, and condemned by the French consul at Malaga, exercising there, by the consent of Spain, the powers of a Prize Court of France, at a time when those two nations were at war against Great Britain, as allies. The question was, whether the condemnation was valid; in other words, whether the French Prize Court had jurisdiction of the case. The decision of the Court of K. B. (two Judges only being present,) was in favour of the jurisdiction. It might here be remarked, that the determination of an English Court of common law, on such a question, made long since our independence, possesses no intrinsic authority here; and that a single case, decided by two Judges only, out of four, or rather out of twelve, has very little authority any where. But, waiving these objections, let it be asked, to what does this decision really amount? Does it affirm the principle contended for; that the Prize Courts of one ally may take cognizance of questions of prize, arising under captures made by the other? Certainly not. It establishes nothing more than this; that one ally may, with the assent of the other, establish Prize Courts of his own, within the territory of that other. This is obviously a very different principle, and entirely free from the objections to which the other is liable. It preserves entire, that great and beneficial rule of public law, founded on the most solid reasons of general safety, convenience, and benefit, that questions of prize shall be exclusively reserved to the Courts of the captors' country. The French Court sitting in Malaga, was as much a French Court, to all intents and purposes, as if it had sat in Marseilles or Brest. Its location in a Spanish port, was a matter in which Spain alone had any concern. It was wholly indifferent to the opposite belligerent, and to neutrals. Its proceedings and decrees were exactly the same in the one case as in the other. The dignity of the French government was as well preserved, the Court had the same control over the captors, the same means of judging how far their conduct was conformable to the instructions, laws, and policy of their government, and the same means of enforcing decrees against them, for costs and damages. Recourse could as effectually be had to their property or their sureties; and, in case of need, to their government, for redress. The rule is, therefore, maintained in this case, and all its beneficial objects are secured. Whereas, by extending this jurisdiction to the Courts of the ally, this great and beneficial rule is wholly subverted.
 
 
 56
 These remarks on the case of Oddy v. Bovill, apply fully to those which are there cited from Robinson's Reports. The first of them, that of the Christopher,[4] by no means comes up to the case just commented on. It was the case of a British ship taken by the French, and carried into a port of Spain, then the ally of France; from whence the papers were sent to Bayonne in France. The ship was there libelled in the Prize Court, and condemned; and the objection to the validity of this condemnation, was not that it was pronounced by the Court of an ally, or by a Court of the captors' government sitting in the territory of an ally; but that when it was pronounced, the res capta was within the territory of the ally. This objection was overruled by Sir W. Scott, on the principle repeatedly affirmed by this Court, that the possession of the captor, for, and in behalf of his government, which is the foundation of the prize jurisdiction, continued in the country of the ally. This principle, after much hesitation, was afterwards extended by him in the case of the Henrick and Maria,[5] to the case of captured property carried into a neutral port, and lying there when it was condemned in a Court of the captors' country. He declared his own opinion to be different, but held himself bound by a practice long established in the Court where he presided.
 
 
 57
 The other cases from Robinson, relied on in Oddy v. Bovill, are those of the Harmony, the Adelaide, and the Betsey Cruger. They are all referred to in a note to the case of the Christopher,[6] and were all cases of condemnations by French Prize Courts, sitting in the territory of Holland, while that power was an ally of France, in the war against Great Britain. The vessels were all condemned by the French commissary of Marine, at Rotterdam. The two first cases occurred in 1799; and an order for farther proof being passed, the question of law respecting the legality of such condemnations was reserved. In the third case, that of the Betsey Cruger, in 1800, it was given up by the counsel, and the legality of the condemnation was admitted by the Court. But, still, it was a condemnation, not by the Court of the ally, as in the case at bar, but by the Court of the captors' country, in strict conformity to the rule for which we contend.
 
 
 58
 Some general expressions of Sir W. Scott, in pronouncing his judgment in the case of the Christopher, are supposed to countenance the doctrine of condemnation by the Courts of an ally. But these expressions must be modified and restrained by reference to the subject matter. He was speaking of a case of condemnation by a Court of the captors' country, sitting in that country, while the res capta was in the territory of an ally. To such a case alone was his attention directed; and in reference to such a case alone are his expressions to be considered. Taken, as they must be, with this limitation, they leave untouched the rule for which we contend.
 
 
 59
 It has been urged, on the other side, that the mere presence of the captured property in the territory of Venezuela, then at war with Spain, gave its Courts a right to treat that property as enemy's property, and to proceed against it as prize. But we are to recollect, that this property was brought there by the captors, in the possession of whose government it was, by force of the seizure; and that this possession, thus acquired, could not rightfully be devested or disturbed. The property did not come thither as the property of Spain, the enemy of Venezuela; but as the property of the captors, her allies, from whom she had no right, or pretence of right, to take it by force. The sovereign of the captors had the possession. The right of the original owner was provisionally devested and destroyed by the capture; and, in this state of things, it could not be considered, or proceeded against, by the government of Venezuela itself, and much less by its Prize Courts, as the property of Spain. Venezuela herself considered the matter in this light. She did not interfere with the possession of the captors, or their rights of property. Her Courts merely attempted, at the instance of the captors, and for their benefit, to exercise, in relation to this property, that prize jurisdiction which belonged exclusively to the Courts of their own country.
 
 
 60
 4. Admitting, however, the sentence of condemnation to be valid; there is still another ground on which the claim set up under it ought to be rejected by this Court. It is admitted that Daniels is a citizen of the United States, resident with his family in Baltimore; and it is in proof, that the vessel with which he made this capture, was fitted out, armed, and manned in the Chesapeake. If, then, he shall appear to be the real claimant, and not Francesche, in which name Childs professes to claim, his case is exposed to the full operation of that maxim of law, which declares, that no rights can be founded on a wrong: Quod ex maleficio non oritur actio. He appears, in that case, in a Court of the United States, to ask its aid in the assertion of a claim founded on a direct violation of our laws and treaties. The acts of Congress expressly forbid, under severe penalties, the armament of vessels within our territory, by our citizens or others, to cruise against any nation with whom we are at peace; and the fourteenth article of the treaty of 1795, with Spain, expressly stipulates, that no American citizen shall take a commission from any foreign power, to cruise against Spain, her people or property, on pain of being treated as pirates. Although it might be difficult, as this Court remarked on a former occasion, to enforce the penalty of piracy against Daniels, there can be no doubt that, if he be the real claimant, his claim is founded on his violation of the laws and treaties of his own country.
 
 
 61
 Here the learned counsel argued minutely upon the facts, to show, that the alleged sale to Francesche was fraudulent, or had never taken place. He also insisted upon the want of a bill of sale, or some equivalent document, as a fatal objection to the claim of the pretended purchaser.[7]
 
 
 62
 5. If, however, Francesche must be considered as a real purchaser for himself; and our objections to the commission under which the capture was made, and to the condemnation founded on it, are to be regarded as invalid; we still insist, that the captured property ought to be restored, on the ground on the illegal outfit of the capturing vessel. Here we are met by two objections; one founded on the condemnation in the Prize Court of Venezuela, by which it is alleged, that all inquiry on the subject is closed; and the other on the commission of prize granted by the government of Venezuela to the captured vessel, after the condemnation.
 
 
 63
 The first of these objections rests on the ground, that both the capture and the condemnation are valid. We have endeavoured to show, that neither of them is so; because the Oriental Republic, of which Artegas, in granting the commission under which the capture was made, claims to act as the chief, is not a government acknowledged by ours, so as to be known to our Courts of justice; and because the Prize Court of Venezuela had no jurisdiction of the capture, admitting it to have been rightfully made. But if the capture and condemnation be free from these objections, what is the effect of the sentence in withdrawing from our Courts the power of protecting and enforcing our neutrality? This is a momentous question, novel in itself, and of the utmost importance in its consequences to the peace and honour of this nation.
 
 
 64
 In discussing it we must first turn our attention to the peculiar state of things to which it applies, to the nature of the war out of which it arises, and to the character and structure of the Courts for whose decisions such an effect is claimed.
 
 
 65
 In adverting to the state of things to which this question applies, we cannot but remark, that the nations of South America, now engaged in war against Spain, are composed of colonies heretofore kept in a most rigid and slavish state of dependence on the mother country, and studiously debarred from all means of acquiring general know dge, habits of self-government, or an acquaintance with the rules and principles of public law, as practised or acknowledged by civilized States. Hence, they may be expected to be, and are, in fact, much more anxious to find means of annoying their enemy, than capable of judging how far those means might be consistent with the rights of neutral and friendly nations. They are, moreover, wholly destitute of the elements of maritime power. Their former masters restrained them from commerce, shipbuilding, and navigation; for all of which, indeed, their country, from its want of ports, is peculiarly unfit. Their pursuits and habits are essentially agricultural. They are destitute of ships, equipments, shipbuilders, and mariners. For a naval force, consequently, the want of which they have always severely felt, they must look to foreigners; and there are none so near as the United States, or so ready to aid them, as that portion of our maritime population, which is ever more eager for enterprise and gain, than scrupulous of means.
 
 
 66
 The manner in which the war has been carried on between the South Americans and Spain, and in which it will, no doubt, continue to be carried on, while it exists, is peculiarly calculated to inflame the resentments of both parties, and to render each more and more eager to seize on every means of distressing its enemy. The South Americans, too, from the infant state and imperfection of their systems of finance, the disturbed state of their country, and their great sacrifices and efforts, are extremely deficient in revenue, and little able to maintain, or to provide a regular naval force for the public service. They cannot take North American vessels into pay, and commission them as public ships. Their only resource, consequently, is to engage and encourage private adventurers, by granting them privateering commissions; and they, unfortunately, find multitudes in this country, who, through lust of gain, or a restless and irregular spirit of enterprise, catch eagerly at this bait. The profits of these irregular adventures depend, almost entirely, on the power of bringing the prizes into the United States; where alone they can find an adequate and advantageous market. Our laws inflict restitution to the former owners, as one of the means, and by far the most efficacious, of restraining these proceedings, so incompatible with our honour, peace, and true interest. Our Courts rigorously and successfully enforce this penalty of restitution. The other, and more penal enactments, are much more easily eluded, by the various artifices and subterfuges which such persons know but too well how to employ. An attempt is now made to elude this penalty also, by the intervention of South American Courts of Prize. Let this attempt succeed; let such a sentence as that now relied on, be once declared by this Court to be a bar to all inquiry concerning the violation of our laws, our treaties, and our neutral obligations, by means of which a capture may have been effected; and what prize, seized by forces provided or augmented in our ports, will ever enter them unprovided with such a se tence? Can we shut our eyes to the character and composition of the Courts where these decrees are pronounced; to the course of proceeding by which they are produced; to the means by which they may be, and in fact are, procured? Can we conceal from ourselves what has passed in this very case, and the manner in which the sentence relied on appears to have been obtained? Can we forget what has passed on this subject, in other cases which have been heard during the present term? With all these instructive lessons before our eyes, can we declare, that the doctrine of the conclusiveness of the sentences of Prize Courts will apply, under such circumstances as are connected with this class of cases, and to such an extent as to shut out all inquiry into those antecedent violations of our laws, in which the captures originated? If such a declaration shall be made by this high tribunal, pronouncing, in the last resort, the maritime law of the country, most certainly no future capture will be made under a South American commission, the fruits of which will not find their way hither immediately, clothed with this protecting mantle; and this certainty of success, and impunity, will multiply tenfold the number of depredators, armed and equipt in our ports, to sally forth and seize the property of our neighbours, our friends, and our own citizens.
 
 
 67
 That we are at liberty to look to considerations of this sort, in the application of established maxims, and rules of law, to new combinations of circumstances, is not only manifest from the nature of the thing, and the general practice of all Courts in analogous cases, but has been emphatically asserted by one of the members of this tribunal, in a very learned and elaborate judgment, which contains many important principles, and cannot fail to attract great attention.[8]
 
 
 68
 Our laws against arming and equipping vessels in our waters, to cruise against our friends, cannot be enforced; our treaties on this subject cannot be executed; our peace and our honour cannot be preserved;—if it shall be adjudged by this Court, that a sentence of condemnation such as this, precludes all inquiry into the measures and means by which the force for making the capture was provided. Considerations of such magnitude would justify and require a modification of the principle on which this doctrine of conclusiveness rests, in its application to cases of this description, if it were so extensive as to embrace them.
 
 
 69
 But we deny that it does embrace them. The principle is merely this; that as Prize Courts are open to all the world, all the world are parties to a prize proceeding, and it, therefore, concludes all the world. There may be some objections to the terms in which this proposition is commonly stated, and to the correctness of the reasoning which it embraces; but it may be admitted to be true in relation to those matters, which come, or might have come, rightfully before the Prize Court. Such are all questions of prize or no prize, and all their incidents. But the rule has never been held to extend, nor do any of the reasons, solid or fanciful, on which it rests, extend to matters which could not, or did not, come rightfully before the Prize Court pronouncing the sentence. Such are all cases where it had no jurisdiction. The point of its jurisdiction, though asserted by it ever so formally and positively, is always open to inquiry; and where it has gone beyond its jurisdiction, its acts are treated as nullities. Why? Because those matters did not, and could not, come rightfully before it. So, its sentence will be disregarded, unless the libel on which it was founded be shown; because, without the libel, it cannot appear that there was jurisdiction; or, consequently, that the matters adjudicated came rightfully before the Court. Now, it is quite clear, that this violation of our neutral duties, and our laws, by providing or augmenting within our territory the force by which this capture was effected, never did come, and never could have come, before the Prize Court at Margaritta. That Court had no knowledge of our laws, and nothing to do with their enforcement. There neither was, nor could be, any party in the proceedings, who had a right to make the objection. It could not have been made by the former owners; who would have been told, and correctly told, that as they were enemies, their property was liable to condemnation, however it might have been seized; that they had nothing to do with the mode, or the means of capture; and that it belonged to the government of the United States alone, whose rights were alleged to have been infringed, to assert and protect those rights, and to complain of the violation of its laws. This would have been a solid and sufficient answer to the former owners. As to the United States; they had not then acknowledged the government of Venezuela, and, consequently, could have no minister or diplomatic agent there, to interpose for the protection of their rights. The question, therefore, never could have been raised or adjudicated in the Prize Court of Venezuela, which had no jurisdiction over it, nor any means of bringing it into judgment. The sentence, consequently, of this Prize Court, is not conclusive on the question of antecedent violations of our laws, committed by making the capture, or preparing or augmenting the force by means of which it was made. These violations formed no part of the question of prize or no prize, or of any of its incidents; and, consequently, could never have come rightfully, and, in fact, did not come at all, before the Court pronouncing this sentence. Therefore they make no part of the sentence, which is not in the least impugned or impeached by inquiring into them, or inflicting on their authors the penalty of restitution.
 
 
 70
 Where, indeed, is the difference between this and any other penalty, pronounced by our laws against similar violators? Will it be pretended that we cannot proceed criminally against these captors, for arming, fitting, or recruiting in our waters, because the fruits of their offence have been adjudged to them as prize, by the Prize Court of Venezuela? I presume not; and if the sentence cannot screen them from one part of the punishment, upon what ground can it be considered as sufficient to screen them from another? Does this Court, in ordering restitution, impeach the sentence, or meddle with it in any manner whatever? Does it inquire whether the sentence was right or wrong? Certainly not; but admitting, that the sentence rightly disposed of the question of prize or no prize, and all its incidents, it seizes the goods, when found within our jurisdiction, as forfeited by the violation of the law, and restores them to the former owner as part of the penalty of this offence. This is the substance, although the form is different.
 
 
 71
 6. The last question in the cause is, whether the commission of prize, granted to this captured vessel by the government of Venezuela, after the condemnation, can shut out all inquiry into the antecedent violation of our laws, by means of which the capture was effected.
 
 
 72
 Much of what has already been said, as to the effect of the condemnation itself, will apply here. We cannot but know how easily such commissions as this may be obtained, how readily they are granted, and how certainly every prize ship would be clothed with one, if it were pronounced here to have the effect of preventing all inquiry into the means or place of capture. The mischief, indeed, thus produced, would be less formidable than the other; because it would apply only to vessels, which are by far the least important objects of capture; but as far as it goes, it would render our laws for the preservation of our neutrality a complete nullity.
 
 
 73
 And upon what principle can it be contended, that a foreign commission of prize will produce such effects? Upon the principle of comity, it is answered; upon the ground of implied assent, under which the public ships of friendly States come into our ports, and which protects them from molestation while here. But this immunity is granted so long as they comport themselves well; and has never been considered as protecting them from the consequences of violating our laws. To this point the case of the Cassius[9] is full and express. The Cassius was not merely a vessel bearing a French commission of prize, but a public ship of the French government, regularly commissioned as a part of the French navy. But she had been fitted out within our territory, in contravention of our laws; and coming, afterwards, within our jurisdiction, under the French flag, and a regular commission, she was proceeded against to forfeiture for this offence. The decision is cited, relied on, and sanctioned by this Court, in the case of the Invincible;[10] and it is declared, that 'there could be no reason suggested for creating a distinction (in relation to the restitution of prizes made in violation of neutrality) between the national and the private armed vessels of a belligerent.'
 
 
 74
 In this case, indeed, of the Cassius, the vessel which was subjected to the operation of the law, notwithstanding her foreign commission, had herself committed the offence of illegal outfit. But this circumstance can make no difference in the application of the principle of comity, and implied license. If that principle would not protect the offending vessel herself, though clothed with a public commission, and the flag of the navy, a fortiori, I apprehend it will not protect the spoil, the fruit of the offence. Why should it protect one more than the other? One is the instrument of the offence, and the other is its product. The offence is committed in relation to both. To punish the offence, and by punishing to restrain its commission, is the object in both cases. This furnishes the reason of the application, which is as strong at least in one case as in the other; indeed, it is much stronger, as far as the practical consequences of the two acts are concerned; for the capturing ship may avoid our ports after she has been well equipped; but the captured ship, which is either to be sold or equipped, must come here for a purchaser, or for equipment. Therefore, in every case, she will be sure to come under the protecting cover of a commission, if you once declare such a cover sufficient.
 
 
 75
 The cases of the Exchange,[11] and the Invincible,[12] have been relied on to support the doctrine of immunity, in application to this case. But neither of them resemble it in its great and distinguishing feature of violation of our neutrality. The Exchange was an American vessel, seized by a French force at St. Sebastians, in Spain, and conducted to Bayonne, where she was taken into the service of the French government, and regularly commissioned as a part of the French marine. She was, afterwards, sent to sea, and on her passage to the East Indies, was compelled to put into one of our ports by stress of weather. While here, she was libelled by the former owner, on the ground, that she had been unlawfully seized, and, consequently, that he never had been devested of his property. The French commander produced his commission; and the question was, whether this vessel, not having been in any manner connected, either as instrument or subject, with a violation of our neutrality, was protected by the comity of nations, and the implied license under which she entered our waters. This is manifestly a question altogether different from that now under consideration. There was no violation of our laws, or our neutral obligations, as in the present case. The vessel had demeaned herself peaceably and correctly while within our territory; and though seized, undoubtedly, in a violent and unjustifiable manner, the seizure was not made by means acquired or increased within our territory. It was, in some measure, analogous to the case of a British, or a Portuguese vessel, seized on the high seas by a cruiser regularly fitted out in Venezuela, and commissioned to cruise against Spain. We could not inquire into the legality of this seizure; which might be legal on the ground of unneutral conduct on the part of the captured vessel. Even if it were one of our own vessels, we could not institute this inquiry, but must, in both cases, remit the question to the domestic forum of the captor. But this case of the Exchange has no analogy whatsoever to the case now in question; where the demand of restitution is founded expressly on the violation of our neutrality, our treaties, and our laws.
 
 
 76
 Neither has the case of the Invincible any analogy to this. That was the case of a French privateer, taken by a British cruiser during the war between Great Britain and France, retaken by an American cruiser, we also being then at war with Great Britain, and brought by the recaptor into an American port, where he libelled her for salvage. While these proceedings were pending, a claim for damages was interposed by certain American citizens, who alleged, that the Invincible, before her capture by the British, had plundered them at sea. And the question was, whether this claim could be sustained, or the claimant must be left to seek his remedy against the privateer, in the Courts of France. This Court decided, that the seizure of the American property was an exercise of the rights of war, which must depend for its justification or condemnation on the circumstances of the case. Consequently, that it involved the question of prize or no prize, which belonged exclusively to the Courts of the captors' country. In this respect, they said, there was no difference between the case of the Invincible, and those of the Cassius and the Exchange; that is, between a private armed ship, and a ship belonging to the national marine. They were all parts of the public force, though raised and supported in different manners; and the legality or illegality of their conduct in making any capture, being a question of prize or no prize, equally belonged to the exclusive cognizance of their domestic tribunals. This principle, it is quite clear, had no analogy to that now advanced in support of the claim of the captors. There was no illegal outfit. No violation of our neutrality, or our laws, was alleged or pretended. The act complained of was a capture, as of enemy's property, under a regular French commission, by a vessel regularly fitted out in the French territory. This capture might be a good prize, according to the law of nations, by reason of some unneutral conduct in the owner, or his agents, which rendered him, pro tanto, a belligerent. Consequently, it was a simple question of prize or no prize, and was most correctly adjudged to belong exclusively to the Courts of the captors' country. But had a violation of our neutrality been alleged, either in making the capture, or in preparing the means of making it, the case would so far have resembled ours, and a different course would, no doubt, have been pursued.
 
 March 15th, 1822.
 
 77
 The cause was continued to the next term, under the following order for farther proof.
 
 
 78
 ORDER. This cause came on to be heard, on the transcript of the record of the Circuit Court of the United States for the District of Maryland, and on certain exhibits and depositions filed by consent, and was argued by counsel. On consideration whereof, this Court doth DIRECT and ORDER, that the respondent have liberty to produce a copy of the libel or other paper on which the sentence of condemnation in the proceedings mentioned was founded, or to account for the nonproduction of such document; and that the parties be at liberty to take any proof which may tend to show, that the sale of the Nereyda was or was not real, and that Antonio Julio Francesche, in the proceedings mentioned, was or was not a bonae fidei purchaser for himself, and is, or is not, the present owner of the said vessel.
 
 Feb. 7th, 1823.
 
 79
 The cause was again argued by the same counsel, on the farther proof produced at the present term.
 
 March 8th.
 
 80
 Mr. Justice STORY delivered the opinion of the Court.
 
 
 81
 This cause was heard at the last term, and an order was then made, requiring the claimant to produce a copy of the libel, or other paper on which the sentence was founded, or to account for the non-production of such document; and also requiring the production of farther proof of the reality of the asserted sale of the Nereyda, and of the proprietary interest of the asserted owner. The cause has now been argued upon the farther proof brought in by the parties, and stands for the judgment of the Court.
 
 
 82
 The Nereyda was a Spanish ship of war, and was captured by the privateer Irresistible, of which John D. Daniels was commander, and Henry Childs, (the claimant,) a lieutenant, under an asserted commission of the Oriental Republic of Rio de la Plata, and was carried into Margaritta, in Venezuela, and there condemned as prize to the captors by the Vice Admiralty Court of that island. A sale is asserted to have been there made of her to the claimant, Francesche, after condemnation, for the sum of thirty thousand dollars. She soon afterwards left Margaritta, under the command of Childs, who was the original prize master, and arrived at Baltimore, the place of residence of Childs and Daniels, who are both American citizens; and her subsequent history, after seizure and delivery upon stipulation or bail to the claimant, shows, that she has continued exclusively under the control, management, and direction of the same persons.
 
 
 83
 The order to produce the libel, or to account for the omission, was made upon the fullest consideration by the Court. Whoever sets up a title under a condemnation, is bound to show, that the Court had jurisdiction of the cause; and that the sentence has been rightly pronounced upon the application of parties competent to ask it. For this purpose, it is necessary to show who are the captors, and how the Court has acquired authority to decide the cause. In the ordinary cases of belligerent capture, no difficulty arises on this subject, for the Courts of the captors have general jurisdiction of prize, and their adjudication is conclusive upon the proprietary interest. But where, as in the present case, the capture is made by captors acting under the commission of a foreign country, such capture gives them a right which no other nation, neutral to them, has authority to impugn, unless for the purpose of vindicating its own violated neutrality. The Courts of another nation, whether an ally or a co-belligerent only, can acquire no general right to entertain cognizance of the cause, unless by the assent, or upon the voluntary submission of the captors. In such a case, it is peculiarly proper to show the jurisdiction of the Court by an exemplification of the proceedings anterior to the sentence of condemnation. And in all cases, it is the habit of Courts of justice to require the production of the libel, or other equivalent document, to verify the nature of the case, and ascertain the foundation of the claim of forfeiture as prize.
 
 
 84
 Notwithstanding the direct order for the production of the libel in this case, none has been produced; nor has the slightest reason been given to account for its non-production. The general usage of maritime nations, to proceed in prize causes to adjudication in this manner, either by a formal libel, or by some equivalent proceeding, is so notorious, that the omission of it is not to be presumed on the part of any civilized government, which professes to proceed upon the principles of international law. How, then, are we to account for the omission in this case? If, by the course of proceedings in Venezuela, a libel does not constitute any part of the acts of its Courts, that could be easily shown. The neglect to show this, or in any manner to account for the non-production of the libel, if it exists, cannot but give rise to unfavourable suspicions as to the whole transaction. And where an order for farther proof is made, and the party disobeys its injunctions, or neglects to comply with them, Courts of Prize are in the habit of considering such negligence as contumacy, leading to presumptions fatal to his claim. We think, in this case, that the non-production of the libel, under the circumstances, would justify the rejection of the claim of Francesche.
 
 
 85
 Upon the other point, as to the proprietary interest of Francesche under the asserted sale, there is certainly very positive testimony of witnesses to the reality of the sale to him, and to his ability to make the purchase. And if this testimony stood alone, although it is certainly not, in all respects, consistent or harmonious, no difficulty would be felt in allowing it entire judicial credence. But it is encountered by very strong circumstances on the other side; and circumstances will sometimes outweigh the most positive testimony. It is remarkable, that from the institution of this cause up to the present time, a period of nearly four years, Francesche has not, by any personal act, made himself a party to the cause. He has never made any affidavit of proprietary interest; he has never produced any document verified by his testimony; he has never recognised the claim made in his behalf; he has never, as far as we have any knowledge, advanced any money for the defence of it. Yet, the brig is admitted to have been a valuable vessel, and was purchased, as is asserted, for the large sum of thirty thousand dollars. Upon an order of farther proof, it is the usual, and almost invariable practice, for the claimant to make proofs, on his own oath, of his proprietary interest, and to give explanations of the nature, origin, and character of his rights, and of the difficulties which surround them. This it is so much the habit of Courts of Prize to expect, that the very absence of such proofs always leads to considerable doubts. How are we to account for such utter indifference and negligence on the part of Francesche, as to the fate of so valuable a property? Is it consistent with the ordinary prudence which every man applies to the preservation of his own interest? Can it be rationally explained, but upon the supposition, that his interest in this suit is nominal, and not real.
 
 
 86
 This is not all. Immediately after the ostensible sale to Francesche, the Nereyda was put in command of Childs, an American citizen, who was an utter stranger to him, as far as we have any means of knowledge, and sailed for Baltimore, the home port of the Irresistible, and the domicil of Daniels and Childs. There is no evidence that she has ever revisited Margaritta, and there is positive evidence, that she has, for the three last years, been in habits of intimacy with the ports of the United States. Where are the owner's instructions, given to the master on his departure for Baltimore? Where is the documentary evidence of Francesche's ownership? Where are the proofs of his disbursements for the vessel during her subsequent voyages? From the time of her voyage to Baltimore, she has remained under the management of Daniels, or Childs, or some other apparent agent of Daniels. She has undergone extensive repairs, her rig has been altered, heavy expenses have been incurred, and a new master has been appointed to her. Under whose authority have all these acts been done? Where are the orders of Francesche for these acts? Daniels has constantly been connected with the vessel; he has superintended her repairs; he or his agents have paid the bills; he is the reputed owner of the vessel; and he has been consulted as to the material operations. How can all these things be, and yet the real owner be a foreigner, a Venezuelian? How can he be presumed to lay by, without any apparent interposition in the destiny of his own vessel?
 
 
 87
 There are some other extraordinary circumstances in the case. The Nereyda arrived at Margaritta under the command of Childs, as prize master; and in a few days afterwards, Daniels arrived there with the Irresistible. The crew of the latter vessel run away with her; and Daniels then sailed in the Nereyda, in pursuit of the privateer, and of course on a voyage for his own peculiar benefit. How is this reconcilable with the supposition of a real sale to Francesche? What interest had the latter in regaining the Irresistible, or subduing a revolted crew? Why should his vessel, after that object was accomplished, have gone to Baltimore? Why should he intrust to strangers, for a voyage in which he had no apparent interest, so valuable a property? If he made any contract for that voyage, why is not that contract produced? These are questions which it seems very difficult to answer in any manner useful to the asserted proprietary interest of Francesche. Yet the facts, to which allusion is here made, are drawn from the farther proof of the claimant; and this farther proof, it is not immaterial to observe, comes not from Margaritta, where Francesche resided, and for aught that appears, still resides; but from La Guayra, with which he is not shown to have any immediate connexion.
 
 
 88
 Looking, therefore, to all the circumstances of the case, the fact of the unchanged possession of the captors, the habits of the vessel, the apparent control of the property by Daniels, the utter absence of all proper documentary proofs of ownership, instructions, disbursements, and even connexion with her on the part of the claimant, we think that there is the strongest reasons to believe, that no real sale ever took place, and that the property remains still in the original captors, unaffected by the asserted transfer. The positive evidence is completely borne down by the strong and irresistible current of circumstantial evidence which opposes it.
 
 
 89
 Upon both grounds, therefore, viz. the omission to produce the original libel, or account for its non-production, and the insufficiency of the proofs of proprietary interest, the Court are of opinion, that the cause must be decided against the asserted claim.
 
 
 90
 If this be so, then, as it is clear that the original outfit of the privateer Irresistible was illegal, upon the principles already established by this Court, the property of the Nereyda remains in his majesty the King of Spain, and ought to be restored accordingly. The decree of the Circuit Court is, therefore, reversed, and the Nereyda is ordered to be restored to the libellant, with costs of suit.
 
 
 91
 Decree reversed.
 
 
 
 a
 These points having been argued by Mr. Hoffman in the preceding cases of the Grand Para, (ante, vol. VII. p. 471.) the Santa Maria, (Id. p. 490.) and the Arrogante Barcelones, (Id. p. 496.) he referred the Court to his former arguments, which will be found reported in those cases.
 
 
 s
 3 Wheat. Rep. 435.
 
 
 t
 9 Ves. 347.
 
 
 [1]
 4 Cranch's Rep. 297.
 
 
 [2]
 Vol. II. p. 257. 281.
 
 
 [3]
 2 East's Rep. 479.
 
 
 [4]
 2 Rob. 273.
 
 
 [5]
 4 Rob. 52.
 
 
 [6]
 2 Rob. 172.
 
 
 [7]
 The Bello Corrunes, 6 Wheat. Rep. 170. The Conception, id. 239.
 
 
 [8]
 Per Mr. Justice STORY, in the case of the Jeune Eugenie, since reported in the second volume of Mr. Mason's Reports.
 
 
 [9]
 1 Dall. Rep. 121. 2 Dall. Rep. 365.
 
 
 [10]
 1 Wheat. Rep. 253.
 
 
 [11]
 7 Cranch's Rep. 116.
 
 
 [12]
 1 Wheat. Rep. 250.